## HERBERT *v.* LANDO ET AL.

No. 77–1105.   Argued October 31, 1978—Decided April 18, 1979

154

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 177. BRENNAN, J., filed an opinion dissenting in part, *post,* p. 180. STEWART, J., *post,* p. 199, and MARSHALL, J., *post,* p. 202, filed dissenting opinions.

*Jonathan W. Lubell* argued the cause for petitioner. With him on the briefs was *Mary K. O'Melveny.*

*Floyd Abrams* argued the cause for respondents. With him on the brief were *Dean Ringel, Kenneth M. Vittor, Carleton G. Eldridge, Jr.,* and *Richard G. Green.**

MR. JUSTICE WHITE delivered the opinion of the Court.

By virtue of the First and Fourteenth Amendments, neither the Federal nor a State Government may make any law "abridging the freedom of speech, or of the press . . . ." The question here is whether those Amendments should be construed to provide further protection for the press when sued for defamation than has hitherto been recognized. More specifically, we are urged to hold for the first time that when a member of the press is alleged to have circulated damaging falsehoods and is sued for injury to the plaintiff's reputation, the plaintiff is barred from inquiring into the editorial processes of those responsible for the publication, even though the inquiry would produce evidence material to the proof of a critical element of his cause of action.

I

Petitioner, Anthony Herbert, is a retired Army officer who had extended wartime service in Vietnam and who received

---

*Briefs of *amici curiae* urging affirmance were filed by *Arthur B. Hanson* and *Frank M. Northam* for the American Newspaper Publishers Assn.; and by *Dan Paul, Parker D. Thomson, Susan B. Werth, Alan R. Finberg, Corydon B. Dunham, Edgar A. Zingman, Richard M. Schmidt, Jr., Samuel E. Klein, J. Laurent Scharff, Robert C. Lobdell, Erwin G. Krasnow, Robert D. Sack, Gary G. Gerlach, Paul E. Kritzer, James A. Strain,* and *Robert Haydock* for New York Times Co. et al.

widespread media attention in 1969–1970 when he accused his superior officers of covering up reports of atrocities and other war crimes. Three years later, on February 4, 1973, respondent Columbia Broadcasting System, Inc. (CBS), broadcast a report on petitioner and his accusations. The program was produced and edited by respondent Barry Lando and was narrated by respondent Mike Wallace. Lando later published a related article in Atlantic Monthly magazine. Herbert then sued Lando, Wallace, CBS, and Atlantic Monthly for defamation in Federal District Court, basing jurisdiction on diversity of citizenship. In his complaint, Herbert alleged that the program and article falsely and maliciously portrayed him as a liar and a person who had made war-crimes charges to explain his relief from command, and he requested substantial damages for injury to his reputation and to the literary value of a book he had just published recounting his experiences.

Although his cause of action arose under New York State defamation law, Herbert conceded that because he was a "public figure" the First and Fourteenth Amendments precluded recovery absent proof that respondents had published a damaging falsehood "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." This was the holding of *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 280 (1964), with respect to alleged libels of public officials, and extended to "public figures" by *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967).[1] Under this rule, absent knowing falsehood, liability requires proof of reckless disregard for truth, that is, that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson,* 390 U. S. 727, 731 (1968). Such "subjective awareness of probable falsity," *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 335 n. 6 (1974), may be found if "there are obvious reasons to doubt

---

[1] Criminal libel prosecutions are subject to the same constitutional limitations. *Garrison* v. *Louisiana,* 379 U. S. 64 (1964).

the veracity of the informant or the accuracy of his reports."
*St. Amant* v. *Thompson, supra,* at 732.

In preparing to prove his case in light of these require-
ments, Herbert deposed Lando at length and sought an order
to compel answers to a variety of questions to which response
was refused on the ground that the First Amendment pro-
tected against inquiry into the state of mind of those who
edit, produce, or publish, and into the editorial process.[2]
Applying the standard of Fed. Rule Civ. Proc. 26 (b), which
permits discovery of any matter "relevant to the subject
matter involved in the pending action" if it would either be
admissible in evidence or "appears reasonably calculated to lead
to the discovery of admissible evidence," the District Court
ruled that because the defendant's state of mind was of "central
importance" to the issue of malice in the case, it was obvious
that the questions were relevant and "entirely appropriate to
Herbert's efforts to discover whether Lando had any reason to
doubt the veracity of certain of his sources, or, equally signifi-
cant, to prefer the veracity of one source over another." 73
F. R. D. 387, 395, 396 (SDNY 1977). The District Court re-
jected the claim of constitutional privilege because it found
nothing in the First Amendment or the relevant cases to permit
or require it to increase the weight of the injured plaintiff's

---

[2] The Court of Appeals summarized the inquiries to which Lando ob-
jected as follows:

"1. Lando's conclusions during his research and investigations regarding
people or leads to be pursued, or not to be pursued, in connection with
the '60 Minutes' segment and the Atlantic Monthly article;

"2. Lando's conclusions about facts imparted by interviewees and his
state of mind with respect to the veracity of persons interviewed;

"3. The basis for conclusions where Lando testified that he did reach a
conclusion concerning the veracity of persons, information or events;

"4. Conversations between Lando and Wallace about matter to be in-
cluded or excluded from the broadcast publication; and

"5. Lando's intentions as manifested by his decision to include or ex-
clude certain material." 568 F. 2d 974, 983 (CA2 1977).

already heavy burden of proof by in effect creating barriers "behind which malicious publication may go undetected and unpunished." *Id.*, at 394. The case was then certified for an interlocutory appeal under 28 U. S. C. § 1292 (b), and the Court of Appeals agreed to hear the case.[3]

A divided panel reversed the District Court. 568 F. 2d 974 (CA2 1977). Two judges, writing separate but overlapping opinions, concluded that the First Amendment lent sufficient protection to the editorial processes to protect Lando from inquiry about his thoughts, opinions, and conclusions with respect to the material gathered by him and about his conversations with his editorial colleagues. The privilege not to answer was held to be absolute. We granted certiorari because of the importance of the issue involved. 435 U. S. 922 (1978). We have concluded that the Court of Appeals misconstrued the First and Fourteenth Amendments and accordingly reverse its judgment.

## II

Civil and criminal liability for defamation was well established in the common law when the First Amendment was adopted, and there is no indication that the Framers intended to abolish such liability. Until *New York Times,* the prevailing jurisprudence was that "[l]ibelous utterances [are not] within the area of constitutionally protected speech . . . ." *Beauharnais* v. *Illinois,* 343 U. S. 250, 266 (1952); see also *Roth* v. *United States,* 354 U. S. 476, 482–483 (1957); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572 (1942); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 707–708 (1931). The accepted view was that neither civil nor crimi-

---

[3] Respondents' petition for leave to appeal from an interlocutory order, which was granted, stated the issue on appeal as follows:

"What effect should be given to the First Amendment protection of the press with respect to its exercise of editorial judgment in pre-trial discovery in a libel case governed by *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964)?"

nal liability for defamatory publications abridges freedom of speech or freedom of the press, and a majority of jurisdictions made publishers liable civilly for their defamatory publications regardless of their intent.[4]  *New York Times* and *Butts* effected major changes in the standards applicable to civil libel actions.  Under these cases public officials and public figures who sue for defamation must prove knowing or reckless falsehood in order to establish liability.  Later, in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), the Court held that nonpublic figures must demonstrate some fault on the defendant's part and, at least where knowing or reckless untruth is not shown, some proof of actual injury to the plaintiff before liability may be imposed and damages awarded.

These cases rested primarily on the conviction that the common law of libel gave insufficient protection to the First Amendment guarantees of freedom of speech and freedom of press and that to avoid self-censorship it was essential that liability for damages be conditioned on the specified showing of culpable conduct by those who publish damaging falsehood.

---

[4] See, *e. g.*, Restatement of Torts § 580 (1938); Pedrick, Freedom of the Press and the Law of Libel: The Modern Revised Translation, 49 Corn. L. Q. 581, 583–584 (1964); Developments in the Law—Defamation, 69 Harv. L. Rev. 875, 902–910 (1956).  In *Peck* v. *Tribune Co.*, 214 U. S. 185, 189 (1909), Mr. Justice Holmes summarized the prevailing view of strict liability in the course of reviewing a libel judgment rendered in a federal diversity of citizenship action:

"There was some suggestion that the defendant published the portrait by mistake, and without knowledge that it was the plaintiff's portrait or was not what it purported to be.  But the fact, if it was one, was no excuse. If the publication was libellous the defendant took the risk.  As was said of such matters by Lord Mansfield, 'Whatever a man publishes he publishes at his peril.'  The *King* v. *Woodfall,* Lofft 776, 781. . . .  The reason is plain.  A libel is harmful on its face.  If a man sees fit to publish manifestly hurtful statements concerning an individual, without other justification than exists for an advertisement or a piece of news, the usual principles of tort will make him liable, if the statements are false or are true only of some one else."

Given the required proof, however, damages liability for defamation abridges neither freedom of speech nor freedom of the press.

Nor did these cases suggest any First Amendment restriction on the sources from which the plaintiff could obtain the necessary evidence to prove the critical elements of his cause of action. On the contrary, *New York Times* and its progeny made it essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant. To be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false. In other cases proof of some kind of fault, negligence perhaps,[5] is essential to recovery. Inevitably, unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination.

It is also untenable to conclude from our cases that, although proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred, plaintiffs may not inquire directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error. In *Butts,* for example, it is evident from the record that the editorial process had been subjected to close examination and that direct as well as indirect evidence was relied on to prove that the defendant magazine had acted with actual malice. The damages verdict was sustained without any suggestion that plaintiff's proof had trenched upon forbidden areas.[6]

---

[5] The definition of fault was to be the responsibility of state laws. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 347 (1974).

[6] See 388 U. S., at 156–159, where Mr. Justice Harlan, writing for a plurality of the Court, reviewed the record under the standard he preferred to apply to public figures, and upheld the verdict for the plaintiff. Mr. Chief Justice Warren independently reviewed the record under the "actual malice" standard of *New York Times* and also concluded in his concurring opinion

Reliance upon such state-of-mind evidence is by no means a recent development arising from *New York Times* and similar cases. Rather, it is deeply rooted in the common-law rule, predating the First Amendment, that a showing of malice on the part of the defendant permitted plaintiffs to

that the verdict should be upheld. *Id.*, at 168–170. The evidence relied on and summarized in both opinions included substantial amounts of testimony that would fall within the editorial-process privilege as defined by respondents. The record before the Court included depositions by the author of the defamatory article, an individual paid to assist the author in preparation, the sports editor of the Saturday Evening Post, and both its managing editor and editor in chief. These depositions revealed the Saturday Evening Post's motives in publishing the story (Record, O. T. 1966, No. 37, pp. 706–717), sources (*id.*, at 364, 662–664, 719–720, 729), conversations among the editors and author concerning the research and development of the article (*id.*, at 363–367, 721–737), decisions and reasons relating to who should be interviewed and what should be investigated (*id.*, at 666–667, 699–700, 734–736, 772–774), conclusions as to the importance and veracity of sources and information presented in the article (*id.*, at 720, 732–735, 737, 771–772, 776), and conclusions about the impact that publishing the article would have on the subject (*id.*, at 714–716, 770). MR. JUSTICE BRENNAN, writing for himself and MR. JUSTICE WHITE, also thought the evidence of record sufficient to satisfy the *New York Times* malice standard. It is quite unlikely that the Court would have arrived at the result it did had it believed that inquiry into the editorial processes was constitutionally forbidden.

The Court engaged in similar analysis of the record in reversing the judgments entered in a companion case to *Butts, Associated Press* v. *Walker*, 388 U. S., at 158–159; *id.*, at 165 (Warren, C. J., concurring); and in *Time, Inc.* v. *Hill*, 385 U. S. 374, 391–394 (1967). In *Hill*, the record included the edited drafts of the allegedly libelous article and an examination and cross-examination of the author. During that examination, the writer explained in detail the preparation of the article, his thoughts, conclusions, and beliefs regarding the material, and a line-by-line analysis of the article with explanations of how and why additions and deletions were made to the various drafts. As in *Butts*, the editorial process was the focus of much of the evidence, and direct inquiry was made into the state of mind of the media defendants. Yet the Court raised no question as to the propriety of the proof.

recover punitive or enhanced damages.[7]   In *Butts*, the Court affirmed the substantial award of punitive damages which in Georgia were conditioned upon a showing of "wanton or reckless indifference or culpable negligence" or " 'ill will, spite, hatred and an intent to injure . . . .' "   388 U. S., at 165–166. Neither Mr. Justice Harlan, *id.*, at 156–162,[8] nor Mr. Chief Justice Warren, concurring, *id.*, at 165–168, raised any question as to the propriety of having the award turn on such a showing or as to the propriety of the underlying evidence,

---

[7] A. Hanson, Libel and Related Torts ¶ 163 (1969); Developments in the Law—Defamation, *supra* n. 4, at 938; 50 Am. Jur. 2d, Libel and Slander § 352 (1970); 53 C. J. S., Libel and Slander § 260 (1955).

The Restatement originally provided in a separate section for the award of punitive damages for malicious defamations.   Restatement of Torts § 1068 (Tent. Draft 13, 1936):

"One who is liable for harm to another's reputation caused by the publication of a libel or slander is also liable for punitive damages if the defamatory matter was published with knowledge of its falsity or if it was published in reckless indifference to its truth or falsity or solely for the purpose of causing harm to the plaintiff's reputation or other  legally protected interest."

The provision was later omitted with the explanation that recovery of punitive damages would be determined by the rules in the Restatement with respect to damages in general.   Restatement of Torts § 1068 (Proposed Final Draft 3, 1937).

*Gertz* v. *Robert Welch, Inc., supra*, at 350, limited the entitlement to punitive damages, but such damages are still awardable upon a showing of knowing or reckless falsehood.

[8] As Mr. Justice Harlan noted, the jury had been instructed in considering punitive damages to assess " 'the reliability, the nature of the sources of the defendant's information, *its acceptance or rejection of the sources*, and its care in checking upon assertions.' "   388 U. S., at 156 (emphasis added).   The Justice found nothing amiss either with the instruction or the result the jury reached under it.   MR. JUSTICE BRENNAN, dissenting in the *Butts* case, *id.*, at 172–174, analyzed the instructions differently but raised no question as to the constitutionality of turning the award of either compensatory or punitive damages upon direct as well as circumstantial evidence going to the mental state of the defendant.

which plainly included direct evidence going to the state of mind of the publisher and its responsible agents.[9]

Furthermore, long before *New York Times* was decided, certain qualified privileges had developed to protect a publisher from liability for libel unless the publication was made with malice.[10] Malice was defined in numerous ways, but in gen-

---

[9] See n. 6, *supra.*

[10] See *Nalle* v. *Oyster,* 230 U. S. 165, 179–180 (1913); *White* v. *Nicholls,* 3 How. 266, 286–292 (1845); T. Plucknett, A Concise History of the Common Law 502 (5th ed. 1956); Hallen, Character of Belief Necessary for the Conditional Privilege in Defamation, 25 Ill. L. Rev. 865 (1931). In *White* v. *Nicholls, supra,* at 290–291, the Court surveyed the common law and summarized the privilege as follows:

"We have thus taken a view of the authorities which treat of the doctrines of slander and libel, and have considered those authorities particularly with reference to the distinction they establish between ordinary instances of slander, written and unwritten, and those which have been styled privileged communications; the peculiar character of which is said to exempt them from inferences which the law has created with respect to those cases that do not partake of that character. Our examination, extended as it may seem to have been, has been called for by the importance of a subject most intimately connected with the rights and happiness of individuals, as it is with the quiet and good order of society. The investigation has conducted us to the following conclusions, which we propound as the law applicable thereto. 1. That every publication, either by writing, printing, or pictures, which charges upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is *prima facie* a libel, and implies malice in the author and publisher towards the person concerning whom such publication is made. Proof of malice, therefore, in the cases just described, can never be required of the party complaining beyond the proof of the publication itself: justification, excuse, or extenuation, if either can be shown, must proceed from the defendant. 2. That the description of cases recognised as privileged communications, must be understood as exceptions to this rule, and as being founded upon some apparently recognised obligation or motive, legal, moral, or social, which may fairly be presumed to have led to the publication, and therefore *prima facie* relieves it from that just implication from which the general rule of the law is deduced. The rule of evidence, as to such cases, is accordingly

eral depended upon a showing that the defendant acted with improper motive.[11] This showing in turn hinged upon the intent or purpose with which the publication was made, the belief of the defendant in the truth of his statement, or upon the ill will which the defendant might have borne toward the plaintiff.[12]

---

so far changed as to impose it on the plaintiff to remove those presumptions flowing from the seeming obligations and situations of the parties, and to require of him to bring home to the defendant the existence of malice as the true motive of his conduct. Beyond this extent no presumption can be permitted to operate, much less be made to sanctify the indulgence of malice, however wicked, however express, under the protection of legal forms. We conclude then that malice may be proved, though alleged to have existed in the proceedings before a court, or legislative body, or any other tribunal or authority, although such court, legislative body, or other tribunal, may have been the appropriate authority for redressing the grievance represented to it; and that proof of express malice in any written publication, petition, or proceeding, addressed to such tribunal, will render that publication, petition, or proceeding, libellous in its character, and actionable, and will subject the author and publisher thereof to all the consequences of libel."

[11] Hallen, *supra,* at 866–867. In some jurisdictions a defendant forfeited his privilege if he published negligently or without probable cause to believe the statement was true. *Id.,* at 867; see *White* v. *Nicholls, supra,* at 291.

[12] See, *e. g.,* 50 Am. Jur. 2d, *supra* n. 7, § 455:

"The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration. The plaintiff may show that the defendant had drawn a pistol at the time he uttered the words complained of; that defendant had tried to kiss and embrace plaintiff just prior to the defamatory publication; or that defendant had failed to make a proper investigation before publication of the statement in question. On cross-examination the

Courts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant and necessary to defeat a conditional privilege or enhance damages.[13] The rules are applicable to the press and to other defendants alike,[14] and it is evident that the courts across the country have long been accepting evidence going to the editorial processes of the media without encountering constitutional objections.[15]

---

defendant may be questioned as to his intent in making the publication." (Footnotes and citations omitted.)

[13] E. g., W. Odgers, A Digest of the Law of Libel and Slander *271–*288 (1st Am. ed. Bigelow 1881); 50 Am. Jur. 2d, supra n. 7, § 455; 53 C. J. S., supra n. 7, § 213.

[14] Cf. Odgers, supra, at *271; F. Holt, The Law of Libel 57 (1st Am. ed. 1818); Billet v. Times-Democrat Publishing Co., 107 La. 751, 32 So. 17 (1902).

[15] In scores of libel cases, courts have addressed the general issue of the admissibility of evidence that would be excluded under the editorial-process privilege asserted here and have affirmed the relevance and admissibility of the evidence on behalf of libel plaintiffs. See, e. g., Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So. 2d 441 (1960) (editor may be cross-examined on meaning intended to be conveyed by passages in magazine article); Freeman v. Mills, 97 Cal. App. 2d 161, 217 P. 2d 687 (1950) (malice may be established by direct proof of the state of mind of a person, or by evidence from which its existence may be inferred); Scott v. Times-Mirror Co., 181 Cal. 345, 184 P. 672 (1919) (all relevant circumstances concerning publication admissible); Sandora v. Times Co., 113 Conn. 574, 155 A. 819 (1931) (all relevant evidence including direct evidence on state of mind or surrounding circumstances—city editor and reporter called to stand and questioned extensively as to motives, circumstances of publication, and general practices); Rice v. Simmons, 2 Del. 309, 31 Am. Dec. 766 (1838) (where question of malice in issue, declarations of publisher at the time of publication admissible as part of the res gestae); Western Union Telegraph Co. v. Vickers, 71 Ga. App. 204, 30 S. E. 2d 440 (1944) (all relevant evidence admissible, including direct evidence of state of mind and surrounding circumstances); Cook v. East Shore Newspapers, 327 Ill. App. 559, 64 N. E. 2d 751 (1945) (all relevant evidence concerning circumstances of publications admissible, including testimony by reporters and employees of defendant); Berger v. Freeman Tribune Publishing Co., 132 Iowa 290, 109 N. W. 784

In the face of this history, old and new, the Court of Appeals nevertheless declared that two of this Court's cases had announced unequivocal protection for the editorial proc-

(1906) (all relevant evidence); *Thompson* v. *Globe Newspaper Co.*, 279 Mass. 176, 181 N. E. 249 (1932) (only evidence on state of mind of those agents of defendant entrusted with determining what shall be published is admissible and material); *Conroy* v. *Fall River Herald News Co.*, 306 Mass. 488, 28 N. E. 2d 729 (1940) (any relevant evidence on defendant's malice); *Cyrowski* v. *Polish-American Pub. Co.*, 196 Mich. 648, 163 N. W. 58 (1917) (testimony of individuals who advised reporter to question plaintiff before publishing defamatory article was admissible on the issue of malice); *Friedell* v. *Blakely Printing Co.*, 163 Minn. 226, 203 N. W. 974 (1925) (any relevant evidence admissible); *Cook* v. *Globe Printing Co.*, 227 Mo. 471, 127 S. W. 332 (1910) (evidence showing that defendant's editorial manager knew an important fact to be false admissible on question of malice); *Butler* v. *Gazette Co.*, 119 App. Div. 767, 104 N. Y. S. 637 (1907) (any evidence admissible to prove actual malice of defendant); *Briggs* v. *Byrd*, 34 N. C. 377 (1851) (express malice may be proved either by direct evidence or surrounding circumstances); *McBurney* v. *Times Publishing Co.*, 93 R. I. 331, 175 A. 2d 170 (1961) (relevant evidence admissible to rebut testimony by reporters and editors that they published without malice); *Lancour* v. *Herald & Globe Assn.*, 112 Vt. 471, 28 A. 2d 396 (1942) (any relevant evidence on malice); *Farrar* v. *Tribune Publishing Co.*, 57 Wash. 2d 549, 358 P. 2d 792 (1961) (all circumstances surrounding publication relevant and admissible).

Similarly, the courts have uniformly admitted such evidence on behalf of the defendant. See, *e. g., Bohan* v. *Record Pub. Co.*, 1 Cal. App. 429, 82 P. 634 (1905) (testimony on good faith); *Hearne* v. *De Young*, 119 Cal. 670, 52 P. 150 (1898) (testimony on sources, precautions taken, and good faith); *Ballinger* v. *Democrat Co.*, 203 Iowa 1095, 212 N. W. 557 (1927) (testimony of reporter and editor on good faith admissible); *Snyder* v. *Tribune Co.*, 161 Iowa 671, 143 N. W. 519 (1913) (testimony as to source of information and good faith of reporter admissible); *Courier-Journal Co.* v. *Phillips*, 142 Ky. 372, 134 S. W. 446 (1911) (testimony of reporter on good faith); *Conner* v. *Standard Pub. Co.*, 183 Mass. 474, 67 N. E. 596 (1903) (testimony as to source of information); *Davis* v. *Marxhausen*, 103 Mich. 315, 61 N. W. 504 (1894) (testimony on good faith and proper precautions taken before publishing); *Julian* v. *Kansas City Star Co.*, 209 Mo. 35, 107 S. W. 496 (1908) (testimony on thoughts and intentions at the time of publication admissible); *Paxton* v. *Woodward*, 31 Mont. 195, 78 P.

ess.  In each of these cases, *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), and *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973), we invalidated governmental efforts to pre-empt editorial decision by requiring the publication of specified material.  In *Columbia Broadcasting System,* it was the requirement that a television network air paid political advertisements and in *Tornillo,* a newspaper's obligation to print a political candidate's reply to press criticism.  Insofar as the laws at issue in *Tornillo* and *Columbia Broadcasting System* sought to control in advance the content of the publication, they were deemed as invalid as were prior efforts to enjoin

---

215 (1904) (testimony as to motive, good faith, and sources); *Las Vegas Sun, Inc.* v. *Franklin,* 74 Nev. 282, 329 P. 2d 867 (1958) (testimony of publisher on good faith); *Lindsey* v. *Evening Journal Assn.,* 10 N. J. Misc. 1275, 163 A. 245 (1932) (testimony on good faith); *Kohn* v. *P&D Publishing Co.,* 169 App. Div. 580, 155 N. Y. S. 455 (1915) (source); *Hains* v. *New York Evening Journal,* 240 N. Y. S. 734 (Sup. Ct. 1930) (source); *Goodrow* v. *Malone Telegram, Inc.,* 235 App. Div. 3, 255 N. Y. S. 812 (1932) (reporter's testimony as to source); *Goodrow* v. *Press Co.,* 233 App. Div. 41, 251 N. Y. S. 364 (1931) (defendant can testify and introduce evidence on his good faith at time of publication); *Kehoe* v. *New York Tribune,* 229 App. Div. 220, 241 N. Y. S. 676 (1930) (testimony on good faith admissible to prevent imposition of punitive damages); *Varvaro* v. *American Agriculturist, Inc.,* 222 App. Div. 213, 225 N. Y. S. 564 (1927) (defendant may testify and introduce evidence on lack of malice); *Van Arsdale* v. *Time, Inc.,* 35 N. Y. S. 2d 951 (Sup. Ct.), aff'd, 265 App. Div. 919, 39 N. Y. S. 2d 413 (1942); *Weichbrodt* v. *New York Evening Journal,* 11 N. Y. S. 2d 112 (Sup. Ct. 1939) (defendant may testify as to good faith and probable cause); *Cleveland Leader Printing Co.* v. *Nethersole,* 84 Ohio St. 118, 95 N. E. 735 (1911) (testimony on good faith); *Cobb* v. *Oklahoma Pub. Co.,* 42 Okla. 314, 140 P. 1079 (1914) (defendant's testimony as to lack of malice and source of information); *Times Pub. Co.* v. *Ray,* 1 S. W. 2d 471 (Tex. Civ. App. 1927), aff'd, 12 S. W. 2d 165 (1929) (testimony as to lack of malice); *Pfister* v. *Milwaukee Free Press Co.,* 139 Wis. 627, 121 N. W. 938 (1909) (testimony as to absence of malice).

None of these cases as much as suggested that there were special limits applicable to the press on the discoverability of such evidence, either before or during trial.

publication of specified materials.[16]   But holdings that neither a State nor the Federal Government may dictate what must or must not be printed neither expressly nor impliedly suggest that the editorial process is immune from any inquiry whatsoever.

It is incredible to believe that the Court in *Columbia Broadcasting System* or in *Tornillo* silently effected a substantial contraction of the rights preserved to defamation plaintiffs in *Sullivan, Butts,* and like cases.   *Tornillo* and *Gertz* v. *Robert Welch, Inc.,* were announced on the same day; and although the Court's opinion in *Gertz* contained an overview of recent developments in the relationship between the First Amendment and the law of libel, there was no hint that a companion case had narrowed the evidence available to a defamation plaintiff.   Quite the opposite inference is to be drawn from the *Gertz* opinion, since it, like prior First Amendment libel cases, recited without criticism the facts of record indicating that the state of mind of the editor had been placed at issue.   Nor did the *Gertz* opinion, in requiring proof of some degree of fault on the part of the defendant editor and in forbidding punitive damages absent at least reckless disregard of truth or falsity, suggest that the First Amendment also foreclosed direct inquiry into these critical elements.[17]

---

[16] As we stated in *Tornillo,* "no 'government agency—local, state, or federal—can tell a newspaper in advance what it can print and what it cannot.'"   418 U. S., at 255–256, quoting *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 400 (1973) (STEWART, J., dissenting).

[17] Two years later, in *Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976), there was likewise no indication that the plaintiff is subject to substantial evidentiary restrictions in proving the defendant's fault.   As MR. JUSTICE POWELL and MR. JUSTICE STEWART stated in concurrence, the answer to this question of culpability "depends upon a careful consideration of all the relevant evidence concerning Time's actions prior to the publication of the 'Milestones' article."   *Id.,* at 465–466.   They suggested that on remand all the evidence of record should be considered, which included evidence going to the beliefs of Time's editorial staff.   See *id.,* at 467–470, and n. 5.

In sum, contrary to the views of the Court of Appeals, according an absolute privilege to the editorial process of a media defendant in a libel case is not required, authorized, or presaged by our prior cases, and would substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times, Butts,* and similar cases.

## III

It is nevertheless urged by respondents that the balance struck in *New York Times* should now be modified to provide further protections for the press when sued for circulating erroneous information damaging to individual reputation. It is not uncommon or improper, of course, to suggest the abandonment, modification, or refinement of existing constitutional interpretation, and notable developments in First Amendment jurisprudence have evolved from just such submissions. But in the 15 years since *New York Times,* the doctrine announced by that case, which represented a major development and which was widely perceived as essentially protective of press freedoms, has been repeatedly affirmed as the appropriate First Amendment standard applicable in libel actions brought by public officials and public figures. *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967); *St. Amant* v. *Thompson,* 390 U. S. 727 (1968); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974); *Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976). At the same time, however, the Court has reiterated its conviction—reflected in the laws of defamation of all of the States—that the individual's interest in his reputation is also a basic concern. *Id.,* at 455–457; *Gertz* v. *Robert Welch, Inc., supra,* at 348–349.

We are thus being asked to modify firmly established constitutional doctrine by placing beyond the plaintiff's reach a range of direct evidence relevant to proving knowing or reckless falsehood by the publisher of an alleged libel, elements that are critical to plaintiffs such as Herbert. The case for

making this modification is by no means clear and convincing, and we decline to accept it.

In the first place, it is plain enough that the suggested privilege for the editorial process would constitute a substantial interference with the ability of a defamation plaintiff to establish the ingredients of malice as required by *New York Times.* As respondents would have it, the defendant's reckless disregard of the truth, a critical element, could not be shown by direct evidence through inquiry into the thoughts, opinions, and conclusions of the publisher, but could be proved only by objective evidence from which the ultimate fact could be inferred. It may be that plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself, but the relevance of answers to such inquiries, which the District Court recognized and the Court of Appeals did not deny, can hardly be doubted. To erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications,[18] and libel plaintiffs are required to prove knowing or reckless falsehood with "convincing clarity." *New York Times Co.* v. *Sullivan,* 376 U. S., at 285–286.

Furthermore, the outer boundaries of the editorial privilege now urged are difficult to perceive. The opinions below did not state, and respondents do not explain, precisely when the editorial process begins and when it ends. Moreover, although we are told that respondent Lando was willing to testify as to what he "knew" and what he had "learned" from his interviews, as opposed to what he "believed," it is not at all clear why the suggested editorial privilege would not cover knowledge as well as belief about the veracity of published

---

[18] See, *e. g.,* the cases collected in n. 15, *supra,* in which media defendants asserted, and courts upheld, the right to present this type of evidence at trial in order to establish good faith and lack of malice.

reports.[19]  It is worth noting here that the privilege as asserted by respondents would also immunize from inquiry the internal communications occurring during the editorial process and thus place beyond reach what the defendant participants learned or knew as the result of such collegiate conversations or exchanges.  If damaging admissions to colleagues are to be barred from evidence, would a reporter's admissions made to third parties not participating in the editorial process also be immune from inquiry?  We thus have little doubt that Herbert and other defamation plaintiffs have important interests at stake in opposing the creation of the asserted privilege.

Nevertheless, we are urged by respondents to override these important interests because requiring disclosure of editorial conversations and of a reporter's conclusions about the veracity of the material he has gathered will have an intolerable chilling effect on the editorial process and editorial decision-making.  But if the claimed inhibition flows from the fear of damages liability for publishing knowing or reckless falsehoods, those effects are precisely what *New York Times* and other cases have held to be consistent with the First Amendment.  Spreading false information in and of itself carries no First Amendment credentials.  "[T]here is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc., supra,* at 340.

Realistically, however, some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz,* and similar cases to limit

---

[19] It was also suggested at oral argument that the privilege would cover questions in the "why" form, but not of the "who," "what," "when," and "where" type.  Tr. of Oral Arg. 32–34.  But it is evident from Lando's deposition that questions soliciting "why" answers relating to the editorial process were answered, *e. g.,* Tr. of Deposition 21, L. 7; 1892, L. 18, and that he refused to answer others that did not fall into this category, *e. g., id.,* at 666, L. 20; 774, L. 5; 877, L. 12; 880, L. 5; 1488, L. 3; 1893, L. 11; see Tr. of Oral Arg. 46.

liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material. Those who publish defamatory falsehoods with the requisite culpability, however, are subject to liability, the aim being not only to compensate for injury but also to deter publication of unprotected material threatening injury to individual reputation. Permitting plaintiffs such as Herbert to prove their cases by direct as well as indirect evidence is consistent with the balance struck by our prior decisions. If such proof results in liability for damages which in turn discourages the publication of erroneous information known to be false or probably false, this is no more than what our cases contemplate and does not abridge either freedom of speech or of the press.

Of course, if inquiry into editorial conclusions threatens the suppression not only of information known or strongly suspected to be unreliable but also of truthful information, the issue would be quite different. But as we have said, our cases necessarily contemplate examination of the editorial process to prove the necessary awareness of probable falsehood, and if indirect proof of this element does not stifle truthful publication and is consistent with the First Amendment, as respondents seem to concede, we do not understand how direct inquiry with respect to the ultimate issue would be substantially more suspect.[20] Perhaps such examination will lead to liability that would not have been found without it, but this does not suggest that the determinations in these instances will be inaccurate and will lead to the suppression of protected information. On the contrary, direct inquiry from the actors, which affords the opportunity to refute inferences that might otherwise be drawn from circumstantial evidence, suggests

---

[20] The kind of question respondents seek to avoid answering is, by their own admission, the easiest to answer. See Tr. of Oral Arg. 31:

"[T]hey are set-up questions for our side. . . . [T]hese are not difficult questions to answer."

that more accurate results will be obtained by placing all, rather than part, of the evidence before the decisionmaker. Suppose, for example, that a reporter has two contradictory reports about the plaintiff, one of which is false and damaging, and only the false one is published. In resolving the issue whether the publication was known or suspected to be false, it is only common sense to believe that inquiry from the author, with an opportunity to explain, will contribute to accuracy. If the publication is false but there is an exonerating explanation, the defendant will surely testify to this effect.[21] Why should not the plaintiff be permitted to inquire before trial? On the other hand, if the publisher in fact had serious doubts about accuracy, but published nevertheless, no undue self-censorship will result from permitting the relevant inquiry. Only knowing or reckless error will be discouraged; and unless there is to be an absolute First Amendment privilege to inflict injury by knowing or reckless conduct, which respondents do not suggest, constitutional values will not be threatened.

It is also urged that frank discussion among reporters and editors will be dampened and sound editorial judgment endangered if such exchanges, oral or written, are subject to inquiry by defamation plaintiffs.[22] We do not doubt the direct relationship between consultation and discussion on the one hand and sound decisions on the other; but whether or not there is liability for the injury, the press has an obvious interest in avoiding the infliction of harm by the publication

---

[21] Often it is the libel defendant who first presents at trial direct evidence about the editorial process in order to establish good faith and lack of malice. That was true in *New York Times Co.* v. *Sullivan,* see, *e. g.,* Record, O. T. 1963, No. 39, p. 762, and in many of the cases cited in n. 15, *supra.*

[22] They invoke our observation in *United States* v. *Nixon,* 418 U. S. 683, 705 (1974): "[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."

of false information, and it is not unreasonable to expect the media to invoke whatever procedures may be practicable and useful to that end. Moreover, given exposure to liability when there is knowing or reckless error, there is even more reason to resort to prepublication precautions, such as a frank interchange of fact and opinion. Accordingly, we find it difficult to believe that error-avoiding procedures will be terminated or stifled simply because there is liability for culpable error and because the editorial process will itself be examined in the tiny percentage of instances in which error is claimed and litigation ensues. Nor is there sound reason to believe that editorial exchanges and the editorial process are so subject to distortion and to such recurring misunderstanding that they should be immune from examination in order to avoid erroneous judgments in defamation suits. The evidentiary burden Herbert must carry to prove at least reckless disregard for the truth is substantial indeed, and we are unconvinced that his chances of winning an undeserved verdict are such that an inquiry into what Lando learned or said during the editorial process must be foreclosed.

This is not to say that the editorial discussions or exchanges have no constitutional protection from casual inquiry. There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury arising from a publication that is alleged to have been knowingly or recklessly false.[23]

---

[23] MR. JUSTICE BRENNAN would extend more constitutional protection to editorial discussion by excusing answers to relevant questions about in-house conversations until the plaintiff has made a prima facie case of falsity. If this suggestion contemplates a bifurcated trial, first on falsity and then on culpability and injury, we decline to subject libel trials to such burdensome complications and intolerable delay. On the other hand,

Evidentiary privileges in litigation are not favored,[24] and even those rooted in the Constitution must give way in proper circumstances. The President, for example, does not have an absolute privilege against disclosure of materials subpoenaed for a judicial proceeding. *United States* v. *Nixon,* 418 U. S. 683 (1974). In so holding, we found that although the President has a powerful interest in confidentiality of communications between himself and his advisers, that interest must yield to a demonstrated specific need for evidence. As we stated, in referring to existing limited privileges against disclosure, "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.,* at 710.

With these considerations in mind, we conclude that the present construction of the First Amendment should not be modified by creating the evidentiary privilege which the respondents now urge.

## IV

Although defamation litigation, including suits against the press, is an ancient phenomenon, it is true that our cases from *New York Times* to *Gertz* have considerably changed the profile of such cases. In years gone by, plaintiffs made out a prima facie case by proving the damaging publication. Truth

---

if, as seems more likely, the prima facie showing does not contemplate a minitrial on falsity, no resolution of conflicting evidence on this issue, but only a credible assertion by the plaintiff, it smacks of a requirement that could be satisfied by an affidavit or a simple verification of the pleadings. We are reluctant to imbed this formalism in the Constitution.

[24] See *Elkins* v. *United States,* 364 U. S. 206, 234 (1960) (Frankfurter, J., dissenting): "Limitations are properly placed upon the operation of this general principle [of no testimonial privilege] only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." See also 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961); 4 The Works of Jeremy Bentham 321 (J. Bowring ed. 1843).

and privilege were defenses. Intent, motive, and malice were not necessarily involved except to counter qualified privilege or to prove exemplary damages. The plaintiff's burden is now considerably expanded. In every or almost every case, the plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability on the part of the publisher. If plaintiffs in consequence now resort to more discovery, it would not be surprising; and it would follow that the costs and other burdens of this kind of litigation would escalate and become much more troublesome for both plaintiffs and defendants. It is suggested that the press needs constitutional protection from these burdens if it is to perform its task,[25] which is indispensable in a system such as ours.

Creating a constitutional privilege foreclosing direct inquiry into the editorial process, however, would not cure this problem for the press. Only complete immunity from liability for defamation would effect this result, and the Court has regularly found this to be an untenable construction of the First Amendment. Furthermore, mushrooming litigation costs, much of it due to pretrial discovery, are not peculiar to the libel and slander area. There have been repeated expressions of concern about undue and uncontrolled discovery, and voices from this Court have joined the chorus.[26] But

---

[25] It is urged that the large costs of defending lawsuits will intimidate the press and lead to self-censorship, particularly where smaller newspapers and broadcasters are involved. It is noted that Lando's deposition alone continued intermittently for over a year and filled 26 volumes containing nearly 3,000 pages and 240 exhibits. As well as out-of-pocket expenses of the deposition, there were substantial legal fees, and Lando and his associates were diverted from news gathering and reporting for a significant amount of time.

[26] *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 740–741 (1975); *ACF Industries, Inc.* v. *EEOC*, 439 U. S. 1081 (1979) (POWELL, J., joined by STEWART and REHNQUIST, JJ., dissenting from denial of certiorari); Burger: Agenda for 2000 A. D.: A Need for Systematic Anticipation, Address at the Pound Conference, 70 F. R. D. 83, 95–96

until and unless there are major changes in the present Rules of Civil Procedure, reliance must be had on what in fact and in law are ample powers of the district judge to prevent abuse.

The Court has more than once declared that the deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials. *Schlagenhauf* v. *Holder,* 379 U. S. 104, 114–115 (1964); *Hickman* v. *Taylor,* 329 U. S. 495, 501, 507 (1947). But the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, *speedy,* and *inexpensive* determination of every action." (Emphasis added.) To this end, the requirement of Rule 26 (b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Rule 26 (c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process.

Whether, as a nonconstitutional matter, however, the trial judge properly applied the rules of discovery was not within the boundaries of the question certified under 28 U. S. C. § 1292 (b) and accordingly is not before us.[27] The judgment of the Court of Appeals is reversed.

*So ordered.*

Mr. Justice Powell, concurring.

I join the opinion of the Court, and write separately to elaborate on what is said in Part IV. I do not see my obser-

---

(1976). The Committee on Rules of Practice and Procedure of the Judicial Conference of the United States has proposed amendments to the Federal Rules of Civil Procedure designed to ameliorate this problem. Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure (1978).

[27] Mr. Justice Stewart would remand to have the trial court rule once again on the relevance of the disputed questions. But the opinion of the

vations as being inconsistent with the Court's opinion; rather, I write to emphasize the additional point that, in supervising discovery in a libel suit by a public figure, a district court has a duty to consider First Amendment interests as well as the private interests of the plaintiff.

I agree with the Court that the explicit constitutional protection of First Amendment rights in a case of this kind, as articulated by *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), should not be expanded to create an evidentiary privilege. With respect to pretrial discovery in a civil proceeding, whatever protection the "exercise of editorial judgment" enjoys depends entirely on the protection the First Amendment accords the product of this judgment, namely, published speech.[1] As the Court makes clear, the privilege respondents claim is unnecessary to safeguard published speech. This holding requires a reversal of the judgment of the Court of Appeals. The Court notes, however, that whether "the trial judge properly applied the rules of discovery," as a nonconstitutional matter, is not before us under the question certified pursuant to 28 U. S. C. § 1292 (b), *ante,* at 177. I assume, therefore, that the litigation will continue and the District Court will review the interrogatories and questions which respondents declined to answer.

---

trial judge reveals that he correctly understood that *New York Times* and *Gertz* required Herbert to prove either knowing falsehood or reckless disregard for truth. With the proper constitutional elements in mind, the judge went on to rule that the questions at issue were clearly relevant and that no constitutional privilege excused Lando from answering them. We hold that the judge committed no constitutional error but, contrary to MR. JUSTICE STEWART, find it inappropriate to review his rulings on relevancy.

[1] Our decisions in *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), and *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973), provide no support for the theory that the prepublication editorial process enjoys a special status under the First Amendment. Rather, those decisions rest on the fundamental principle that the coerced publication of particular views, as much as their suppression, violates the freedom of speech.

Earlier this Term, in dissenting from the denial of certiorari in *ACF Industries, Inc.* v. *EEOC,* 439 U. S. 1081 (1979), I had occasion to comment upon the widespread abuse of discovery that has become a prime cause of delay and expense in civil litigation. *Id.,* at 1086–1088. At the 1946 Term, just a few years after adoption of the Federal Rules of Civil Procedure, this Court stated "that the deposition-discovery rules are to be accorded a broad and liberal treatment." *Hickman* v. *Taylor,* 329 U. S. 495, 507 (1947). The bar and trial courts understandably responded affirmatively. As the years have passed, discovery techniques and tactics have become a highly developed litigation art—one not infrequently exploited to the disadvantage of justice. As the Court now recognizes, the situation has reached the point where there is serious "concern about undue and uncontrolled discovery." *Ante,* at 176.[2] In view of the evident attention given discovery by the District Judge in this case, it cannot be said that the process here was "uncontrolled." But it certainly was protracted and undoubtedly was expensive for all concerned.[3]

Under present Rules the initial inquiry in enforcement of any discovery request is one of relevance. Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated. On the one hand, as this Court has repeatedly recognized, the solicitude for First Amendment rights evidenced in our opinions reflects concern for the

---

[2] See ABA, Report of Pound Conference Follow-Up Task Force, 74 F. R. D. 159, 191–192 (1976); Erickson, The Pound Conference Recommendations: A Blueprint for the Justice System in the Twenty-First Century, 76 F. R. D. 277, 288–290 (1978); Bell, The Pound Conference Follow-Up: A Response from the United States Department of Justice, 76 F. R. D. 320, 328 (1978); Powell, Reforms—Long Overdue, 33 Record of N. Y. C. B. A. 458, 461–463 (1978).

[3] See *ante,* at 176 n. 25.

important public interest in a free flow of news and commentary. See *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 781–783 (1978); *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 862–863 (1974) (POWELL, J., dissenting). On the other hand, there also is a significant public interest in according to civil litigants discovery of such matters as may be genuinely relevant to their lawsuit. Although the process of weighing these interests is hardly an exact science, it is a function customarily carried out by judges in this and other areas of the law. In performing this task, trial judges—despite the heavy burdens most of them carry—are now increasingly recognizing the "pressing need for judicial supervision." *AFC Industries, Inc.* v. *EEOC*, *supra*, at 1087.[4]

The Court today emphasizes that the focus must be on relevance, that the injunction of Fed. Rule Civ. Proc. 1 must be heeded, and that "district courts should not neglect their power to restrict discovery" in the interest of justice or to protect the parties from undue burden or expense. *Ante*, at 177; see Fed. Rule Civ. Proc. 26 (c). I join the Court's opinion on my understanding that in heeding these admonitions, the district court must ensure that the values protected by the First Amendment, though entitled to no constitutional privilege in a case of this kind, are weighed carefully in striking a proper balance.

MR. JUSTICE BRENNAN, dissenting in part.

Respondents are representatives of the news media. They are defendants in a libel action brought by petitioner, Lieu-

---

[4] In some instances, it might be appropriate for the district court to delay enforcing a discovery demand, in the hope that the resolution of issues through summary judgment or other developments in discovery might reduce the need for the material demanded. It is pertinent to note that respondents here had not sought summary judgment on any issue at the time discovery was opposed, and have not argued that discovery should be postponed until other issues on which liability depends are resolved.

tenant Colonel Anthony Herbert (U. S. Army, Ret.), who is concededly a public figure. The Court today rejects respondents' claim that an "editorial privilege" shields from discovery information that would reveal respondents' editorial processes. I agree with the Court that no such privilege insulates factual matters that may be sought during discovery, and that such a privilege should not shield respondents' "mental processes." 568 F. 2d 974, 995 (CA2 1977) (Oakes, J.). I would hold, however, that the First Amendment requires predecisional communication among editors to be protected by an editorial privilege, but that this privilege must yield if a public-figure plaintiff is able to demonstrate to the prima facie satisfaction of a trial judge that the publication in question constitutes defamatory falsehood.

## I

The Court of Appeals below stated that "the issue presented by this case is whether, and to what extent, inquiry into the editorial process, conducted during discovery in a *New York Times* v. *Sullivan* type libel action, impermissibly burdens the work of reporters and broadcasters." *Id.*, at 979 (Kaufman, C. J.). The court grouped the discovery inquiries objected to by respondents into five categories:

"1. Lando's conclusions during his research and investigations regarding people or leads to be pursued, or not to be pursued, in connection with the '60 Minutes' segment and the Atlantic Monthly article;

"2. Lando's conclusions about facts imparted by interviewees and his state of mind with respect to the veracity of persons interviewed;

"3. The basis for conclusions where Lando testified that he did reach a conclusion concerning the veracity of persons, information or events;

"4. Conversations between Lando and Wallace about matter to be included or excluded from the broadcast publication; and

"5. Lando's intentions as manifested by his decision to include or exclude certain material." *Id.,* at 983.

The Court of Appeals concluded:

"If we were to allow selective disclosure of how a journalist formulated his judgments on what to print or not to print, we would be condoning judicial review of the editor's thought processes. Such an inquiry, which on its face would be virtually boundless, endangers a constitutionally protected realm, and unquestionably puts a freeze on the free interchange of ideas within the newsroom." *Id.,* at 980.

The Court of Appeals held that all five categories of information sought by petitioner were shielded by an editorial privilege.

The holding of the Court of Appeals presents a novel and difficult question of law. Federal Rule Civ. Proc. 26 (b)(1) provides: "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action . . . ." (Emphasis supplied.) The instant case is brought under diversity jurisdiction, 28 U. S. C. § 1332 (a), and Fed. Rule Evid. 501 states that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness [or] person . . . shall be determined in accordance with State law." Although *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), placed constitutional limits on state libel claims, it did not itself create a federal cause of action for libel. The "rule of decision" in this case, therefore, is defined by state law. There is no contention, however, that applicable state law encompasses an editorial privilege. Thus if we were to create and apply such a privilege, it would have to be constitutionally grounded, as, for example, is executive privilege, see *United States* v. *Nixon,* 418 U. S. 683 (1974), or the privilege against self-incrimination. See *McCarthy* v. *Arndstein,* 266 U. S. 34 (1924). The exist-

ence of such a privilege has never before been urged before this Court.

This case must be approached from the premise that pretrial discovery is normally to be "accorded a broad and liberal treatment," *Hickman* v. *Taylor,* 329 U. S. 495, 507 (1947), and that judicial creation of evidentiary privileges is generally to be discouraged. We have in the past, however, recognized evidentiary privileges in order to protect "interests and relationships which . . . are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." E. Cleary, McCormick on Evidence 152 (2d ed. 1972). For example, *Hickman* v. *Taylor, supra,* created a qualified privilege for attorneys' work products in part because, without such a privilege, "[t]he effect on the legal profession would be demoralizing." 329 U. S., at 511. Similarly, *Roviaro* v. *United States,* 353 U. S. 53 (1957), recognized a qualified "informer's privilege" for "the furtherance and protection of the public interest in effective law enforcement." *Id.,* at 59.

The inquiry to be pursued, therefore, is whether the creation of an editorial privilege would so further the purposes and goals of the constitutional scheme as embodied in the First Amendment, as to justify "some incidental sacrifice" of evidentiary material. This inquiry need not reach an inflexible result: The justifications for an editorial privilege may well support only a qualified privilege which, in appropriate instances, must yield to the requirements of "the administration of justice."

## II

Mr. Justice Brandeis reminded us over a half century ago that "[t]hose who won our independence . . . valued liberty both as an end and as a means."[1] *Whitney* v. *California,* 274

[1] Freedom of speech is itself an end because the human community is in large measure defined through speech; freedom of speech is therefore intrinsic to individual dignity. This is particularly so in a democracy

U. S. 357, 375 (1927) (concurring opinion). In its instrumental aspect, the First Amendment serves to foster the values of democratic self-government. This is true in several senses. The First Amendment bars the state from imposing upon its citizens an authoritative vision of truth.[2] It prohibits the state from interfering with the communicative processes

---

like our own, in which the autonomy of each individual is accorded equal and incommensurate respect. As the Court stated in *Cohen* v. *California*, 403 U. S. 15, 24 (1971):

"The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests."

Respondents properly do not rest their arguments for an editorial privilege on the value of individual self-expression. So grounded, an editorial privilege might not stop short of shielding all speech.

[2] As Professor Zechariah Chafee, Jr., stated in 1946:

"The First Amendment protects . . . a social interest in the attainment of truth, so that the country may not only adopt the wisest course of action but carry it out in the wisest way. . . . Truth can be sifted out from falsehood only if the government is vigorously and constantly cross-examined . . . ." Free Speech in the United States 33.

Mr. Justice Holmes gave this social value a broader and more theoretical formulation:

"Persecution for the expression of opinions seems to me perfectly logical. If you have no doubt of your premises or your power and want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition. . . . But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. . . . While that experiment is part of our system I think that we should be

through which its citizens exercise and prepare to exercise their rights of self-government.[3]   And the Amendment shields those who would censure the state or expose its abuses.[4]

eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country." *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (dissenting opinion). See *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969).

[3] "Just so far as, at any point, the citizens who are to decide an issue are denied acquaintance with information or opinion or doubt or disbelief or criticism which is relevant to that issue, just so far the result must be ill-considered, ill-balanced planning for the general good. *It is that mutilation of the thinking process of the community against which the First Amendment to the Constitution is directed.*   The principle of the freedom of speech springs from the necessities of the program of self-government. It is not a Law of Nature or of Reason in the abstract.   It is a deduction from the basic American agreement that public issues shall be decided by universal suffrage."   A. Meiklejohn, Political Freedom: The Constitutional Powers of the People 27 (1965).

See *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 765 (1976); Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv. L. Rev. 1 (1965).

[4] See Blasi, The Checking Value in First Amendment Theory, 1977 Am. Bar Found. Research J. 521.   Lord Erskine, while defending Thomas Paine in his trial for seditious libel, offered a compact and eloquent statement of this position:

"Gentlemen, I have insisted, at great length, upon the origin of governments, and detailed the authorities which you have heard upon the subject, because I consider it to be not only an essential support, but the very foundation of the liberty of the press.   If Mr. Burke be right in his principles of government, I admit that the press, in my sense of its freedom, ought not to be free, nor free in any sense at all; and that all addresses to the people upon the subjects of government, and all speculations of amendment, of what kind or nature soever, are illegal and criminal; since if the people have, with out possible re-call, delegated all their authorities, they have no jurisdiction to act, and therefore none to think or write upon such subjects; and it would be a libel to arraign govern-

These various senses can sometimes weave together, as can be seen in the letter of 1774 addressed by the First Continental Congress to the inhabitants of Quebec, listing the rights "a profligate [English] Ministry are now striving, by force of arms, to ravish from us":

> "The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs." [5]

---

ment or any of its acts, before those who have no jurisdiction to correct them. But on the other hand . . . no legal argument can shake the freedom of the press in my sense of it, if I am supported in my doctrines concerning the great unalienable right of the people, to reform or to change their governments. It is because the liberty of the press resolves itself into this great issue, that it has been in every country the last liberty which subjects have been able to wrest from power. Other liberties are held under governments, but the liberty of opinion keeps governments themselves in due subjection to their duties." 1 Speeches of Lord Erskine 524–525 (J. High ed. 1876).

This position is often predicated upon a natural adversity between the government and the press. See A. Bickel, The Morality of Consent 80–88 (1975). In *Mills* v. *Alabama,* 384 U. S. 214, 219 (1966), for example, we stated:

"[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."

[5] 1 Journals of the Continental Congress 108 (1774) (W. Ford ed. 1904):

Although the various senses in which the First Amendment serves democratic values will in different contexts demand distinct emphasis and development, they share the common characteristic of being instrumental to the attainment of social ends. It is a great mistake to understand this aspect of the First Amendment solely through the filter of individual rights.[6] This is the meaning of our cases permitting a litigant to challenge the constitutionality of a statute as overbroad under the First Amendment if the statute "prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct." *NAACP* v. *Button,* 371 U. S. 415, 432 (1963). Our reasoning is that First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society," *id.,* at 433, and that a litigant should therefore be given standing to assert this more general social interest in the "vindication of freedom of expression." *Dombrowski* v. *Pfister,* 380 U. S. 479, 487 (1965). See *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98 (1940). It is also the meaning of the "actual malice" standard set forth in *New York Times Co.* v. *Sullivan,* 376 U. S., at 279–280. Even though false information may have no intrinsic First Amendment worth, *St. Amant* v. *Thompson,* 390 U. S. 727, 732 (1968), and even though a particular defendant may have published false information, his freedom of expression is nevertheless protected in the absence of actual malice because, "to insure the ascertainment and publication

---

[6] "[I]t is useless to define free speech by talk about rights. The agitator asserts his constitutional right to speak, the government asserts its constitutional right to wage war. The result is a deadlock.

. . . . .

"The true boundary line of the First Amendment can be fixed only when Congress and the courts realize that the principle on which speech is classified as lawful or unlawful involves the balancing against each other of two very important social interests, in public safety and in the search for truth." Chafee, *supra* n. 2, at 31, 35.

of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *Ibid.*[7]

In recognition of the social values served by the First Amendment, our decisions have referred to "the *right of the public* to receive suitable access to social, political, esthetic, moral, and other ideas and experiences," *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969) (emphasis supplied), and to "the circulation of information *to which the public is entitled* in virtue of the constitutional guaranties." *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (emphasis supplied). In *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967), we stated that the guarantees of the First Amendment "are not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our political system and an open society." *Id.,* at 389.

The editorial privilege claimed by respondents must be carefully analyzed to determine whether its creation would significantly further these social values recognized by our prior decisions. In this analysis it is relevant to note that respondents are representatives of the communications media, and that the "press and broadcast media," *Gertz* v. *Robert*

---

[7] In an analogous manner the Court has, over my strong protest, analyzed the exclusionary rule as permitting a defendant to assert social interests that do not reduce to his personal rights:

"The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. Post-*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any '[r]eparation comes too late.' *Linkletter* v. *Walker,* 381 U. S. 618, 637 (1965). Instead,

" 'the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . .' *United States* v. *Calandra,* [414 U. S. 338, 348 (1974)]." *Stone* v. *Powell,* 428 U. S. 465, 486 (1976).

*Welch, Inc.,* 418 U. S. 323, 343 (1974),[8] have played a dominant and essential role in serving the "informative function," *Branzburg* v. *Hayes,* 408 U. S. 665, 705 (1972), protected by the First Amendment. "The press cases emphasize the special and constitutionally recognized role of that institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 781 (1978).[9] "The newspapers, magazines and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern." *Grosjean* v. *American Press Co., supra,* at 250. An editorial privilege would thus not be merely personal to respondents, but would shield the press in its function "as an agent of the public at large. . . . The press is the necessary representative of the public's interest in this context and the instrumentality which effects the public's right." *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 863–864 (1974) (Powell, J., dissenting).

---

[8] Compare *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 282 (1964): "In *Barr* v. *Matteo,* 360 U. S. 564, 575, this Court held the utterance of a federal official to be absolutely privileged if made 'within the outer perimeter' of his duties. . . . Analogous considerations support the privilege for the *citizen-critic* of government. It is as much his duty to criticize as it is the official's duty to administer." (Emphasis supplied.)

[9] Of course, "the press does not have a monopoly on either the First Amendment or the ability to enlighten." *First National Bank of Boston* v. *Bellotti,* 435 U. S., at 782. "The informative function asserted by representatives of the organized press . . . is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public . . . ." *Branzburg* v. *Hayes,* 408 U. S., at 705.

## III

*Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), struck down as undue interference with the editorial process a Florida statute granting a political candidate a right to equal space to reply to criticisms of his record by a newspaper.

> "Even if a newspaper would face no additional costs to comply with a compulsory access law and would not be forced to forgo publication of news or opinion by the inclusion of a reply, the Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors. A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time." *Id.,* at 258.

See *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 391 (1973); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 120, 124–125 (1973). Through the editorial process expression is composed; to regulate the process is therefore to regulate the expression. The autonomy of the speaker is thereby compromised, whether that speaker is a large urban newspaper or an individual pamphleteer. The print and broadcast media, however, because of their large organizational structure, cannot exist without some form of editorial process. The protection

of the editorial process of these institutions thus becomes a matter of particular First Amendment concern.[10]

There is in this case, however, no direct government regulation of respondents' editorial process. But it is clear that disclosure of the editorial process of the press will increase the likelihood of large damages judgments in libel actions, and will thereby discourage participants in that editorial process.[11] And, as *New York Times* stated: "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute." 376 U. S., at 277. Of course *New York Times* set forth a substantive standard defining that speech unprotected by the First Amendment, and respondents' editorial process cannot be shielded merely so as to block judicial determination of whether respondents have in fact engaged in such speech. As the Court states: "[I]f the claimed inhibition flows from the fear of damages liability for publishing knowing or reckless falsehoods, those effects are precisely what *New York Times* and

---

[10] This is not, of course, to imply that the editorial process of persons or institutions other than the communications media does not merit First Amendment protection.

[11] The editorial process could be inhibited in other ways as well. For example, public figures might bring harassment suits against the media in order to use discovery to uncover aspects of the editorial process which, if publicly revealed, would prove embarrassing to the press. In different contexts other First Amendment values might be affected. If sued by a powerful political figure, for example, journalists might fear reprisals for information disclosed during discovery. Cf. *Reporters Committee for Freedom of the Press* v. *American Telephone & Telegraph Co.*, 192 U. S. App. D. C. 376, 593 F. 2d 1030 (1978). Such a chilling effect might particularly impact on the press' ability to perform its "checking" function. See n. 4, *supra*. In the instant case, however, petitioner is not such a public official, nor are respondents claiming to be suffering the effects of such a chill.

other cases have held to be consistent with the First Amendment." *Ante,* at 171. Our inquiry, therefore, becomes the independent First Amendment values served by the editorial process and the extent to which exposure of that process would impair these First Amendment values.

In *Tornillo* we defined the editorial process in a functional manner, as that process whereby the content and format of published material is selected. The Court of Appeals below identified two aspects of this process. The first concerns "the mental processes of the press regarding 'choice of material' . . . ." 568 F. 2d, at 995 (Oakes, J.). This aspect encompasses an editor's subjective "thought processes," his "thoughts, opinions and conclusions." *Id.,* at 980, 984 (Kaufman, C. J.). The Court of Appeals concluded that if discovery were permitted concerning this aspect of the editorial process, journalists "would be chilled in the very process of thought." *Id.,* at 984.

I find this conclusion implausible. Since a journalist cannot work without such internal thought processes, the only way this aspect of the editorial process can be chilled is by a journalist ceasing to work altogether. Given the exceedingly generous standards of *New York Times,* this seems unlikely. Moreover, *New York Times* removed First Amendment protection from defamatory falsehood published with actual malice— in knowing or reckless disregard of the truth.[12] Subsequent decisions have made clear that actual malice turns on a journalist's "subjective awareness of probable falsity." *Gertz* v. *Robert Welch, Inc.,* 418 U. S., at 335 n. 6. It would be anomalous to turn substantive liability on a journalist's subjective attitude and at the same time to shield from disclosure the most direct evidence of that attitude. There will be, of

---

[12] Elements of petitioner's complaint appear to set forth a claim for invasion of privacy. See *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967). The case has come to this Court framed as a libel action, however, and I shall so consider it.

course, journalists at the margin—those who have some awareness of the probable falsity of their work but not enough to constitute actual malice—who might be discouraged from publication. But this chill emanates chiefly from the substantive standard of *New York Times,* not from the absence of an editorial privilege.

The second aspect of the editorial privilege identified by the Court of Appeals involves "the free interchange of ideas within the newsroom," 568 F. 2d, at 980 (Kaufman, C. J.), "the relationship among editors." *Id.,* at 993 (Oakes, J.). Judge Oakes concluded that "[i]deas expressed in conversations, memoranda, handwritten notes and the like, if discoverable, would in the future 'likely' lead to a more muted, less vigorous and creative give-and-take in the editorial room." *Id.,* at 993–994. Chief Judge Kaufman stated that "[a] reporter or editor, aware that his thoughts might have to be justified in a court of law, would often be discouraged and dissuaded from the creative verbal testing, probing, and discussion of hypotheses and alternatives which are the *sine qua non* of responsible journalism." *Id.,* at 980.

An editorial privilege protecting this aspect of the editorial process would essentially be analogous to the executive privilege which shields the "advisory opinions, recommendations and deliberations . . . by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss, Jena,* 40 F. R. D. 318, 324 (DC 1966). As our cases interpreting Exemption 5 of the Freedom of Information Act, 5 U. S. C. § 552 (b)(5), make clear, this privilege would not protect merely "factual" material, but only "deliberative or policymaking processes." *EPA* v. *Mink,* 410 U. S. 73, 89 (1973). The rationale for this privilege was succinctly stated in *United States* v. *Nixon,* 418 U. S., at 705: "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."

The same rationale applies to respondents' proposed editorial privilege. Just as the possible political consequences of disclosure might undermine predecisional communication within the Executive Branch, see *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 151 (1975), so the possibility of future libel judgments might well dampen full and candid discussion among editors of proposed publications. Just as impaired communication "clearly" affects "the quality" of executive decisionmaking, *ibid.,* so too muted discussion during the editorial process will affect the quality of resulting. publications. Those editors who have doubts might remain silent; those who would prefer to follow other investigative leads might be restrained; those who would otherwise counsel caution might hold their tongues. In short, in the absence of such an editorial privilege the accuracy, thoroughness, and profundity of consequent publications might well be diminished.

Such a diminution would affect First Amendment values. The Amendment embraces the public's interest in "accurate and effective reporting by the news media." *Saxbe* v. *Washington Post Co.,* 417 U. S., at 863 (POWELL, J., dissenting). "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. . . . Abridgment of freedom of speech and of the press . . . impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government." [13] *Thornhill* v. *Alabama,* 310 U. S. 88, 95 (1940). Petitioner is concededly a public figure; "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of

---

[13] Were the plaintiff in this case a public official intent upon using discovery to intimidate the press, other First Amendment values might well be implicated. See n. 11, *supra.*

'public officials.'" *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 164 (1967) (Warren, C. J., concurring in result). To the extent coverage of such figures becomes fearful and inhibited, to the extent the accuracy, effectiveness, and thoroughness of such coverage is undermined, the social values protected by the First Amendment suffer abridgment.

I find compelling these justifications for the existence of an editorial privilege. The values at issue are sufficiently important to justify some incidental sacrifice of evidentiary material.[14] The Court today concedes the accuracy of the underlying rationale for such a privilege, stating that "[w]e do not doubt the direct relationship between consultation and discussion on the one hand and sound decisions on the other . . . ." *Ante,* at 173. The Court, however, contents itself with the curious observation that "given exposure to liability when there is knowing or reckless error, there is even more reason to resort to prepublication precautions, such as a frank interchange of fact and opinion." *Ante,* at 174. Be-

---

[14] My Brother POWELL writes separately to emphasize that district courts must carefully weigh "the values protected by the First Amendment" in determining the relevance of discovery requests. *Ante,* at 180. At the same time, however, he concludes that there should not be an evidentiary privilege which protects the editorial process because "whatever protection the 'exercise of editorial judgment' enjoys depends entirely on the protection the First Amendment accords the product of this judgment, namely, published speech," *ante,* at 178, and because an editorial privilege "is unnecessary to safeguard published speech." *Ibid.* I assume my Brother POWELL means by this that the exposure of predecisional editorial discussions will not meaningfully affect the nature of subsequent publications. But if this is true, I have difficulty understanding exactly what First Amendment values my Brother POWELL expects district courts to place in the balance. He may be suggesting that First Amendment values are impaired merely by requiring media defendants to respond to discovery requests like any other litigant. But even if district courts were to apply stricter standards of relevance in cases involving media defendants, the burden of pretrial discovery would be only marginally decreased, and it does not seem justified to assume that this result would meaningfully affect the nature of subsequent publications.

cause such "prepublication precautions" will often prove to be extraordinarily damaging evidence in libel actions, I cannot so blithely assume such "precautions" will be instituted, or that such "frank interchange" as now exists is not impaired by its potential exposure in such actions.

I fully concede that my reasoning is essentially paradoxical. For the sake of more accurate information, an editorial privilege would shield from disclosure the possible inaccuracies of the press; in the name of a more responsible press, the privilege would make more difficult of application the legal restraints by which the press is bound. The same paradox, however, inheres in the concept of an executive privilege: so as to enable the government more effectively to implement the will of the people, the people are kept in ignorance of the workings of their government. The paradox is unfortunately intrinsic to our social condition. Judgment is required to evaluate and balance these competing perspectives.

Judgment is also required to accommodate the tension between society's "pervasive and strong interest in preventing and redressing attacks upon reputation," *Rosenblatt v. Baer,* 383 U. S. 75, 86 (1966), and the First Amendment values that would be served by an editorial privilege. In my view this tension is too fine to be resolved in the abstract. As is the case with executive privilege, there must be a more specific balancing of the particular interests asserted in a given lawsuit. A general claim of executive privilege, for example, will not stand against a "demonstrated, specific need for evidence . . . ." *United States v. Nixon,* 418 U. S., at 713. Conversely, a general statement of need will not prevail over a concrete demonstration of the necessity for executive secrecy. *United States v. Reynolds,* 345 U. S. 1, 11 (1953). Other evidentiary privileges are similarly dependent upon the particular exigencies demonstrated in a specific lawsuit. *Roviaro v. United States,* 353 U. S. 53 (1957), for example, held that the existence of an informer's privilege depends

"on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*, at 62. *Hickman* v. *Taylor*, 329 U. S. 495 (1947), similarly required ad hoc balancing to determine the existence of an attorneys' work-product privilege. The procedures whereby this balancing is achieved, so far from constituting mere "formalism," *ante*, at 175 n. 23, are in fact the means through which courts have traditionally resolved conflicts between competing social and individual interests.

In my judgment, the existence of a privilege protecting the editorial process must, in an analogous manner, be determined with reference to the circumstances of a particular case. In the area of libel, the balance struck by *New York Times* between the values of the First Amendment and society's interest in preventing and redressing attacks upon reputation must be preserved. This can best be accomplished if the privilege functions to shield the editorial process from general claims of damaged reputation. If, however, a public-figure plaintiff is able to establish, to the prima facie satisfaction of a trial judge, that the publication at issue constitutes defamatory falsehood,[15] the claim of damaged reputation becomes specific and demonstrable, and the editorial privilege must yield.[16] Contrary to the suggestion of the Court, an editorial privilege so understood would not create "a substantial interference with the ability of a defamation plaintiff to establish the ingredients of malice as required by *New York Times.*" *Ante*, at 170. Requiring a public-figure plaintiff to make a

---

[15] See *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6 (1970).

[16] I do not reach the case in which a media defendant has more specific and concrete interests at stake. See nn. 11 and 13, *supra.* Nor do I reach the case in which a litigant with more weighty interests than a civil plaintiff attempts to overcome a claim of editorial privilege. See, *e. g., Associated Press* v. *NLRB,* 301 U. S. 103 (1937); *Associated Press* v. *United States,* 326 U. S. 1 (1945).

prima facie showing of defamatory falsehood will not consti-
tute an undue burden, since he must eventually demonstrate
these elements as part of his case in chief.[17]    And since edi-
torial privilege protects only deliberative and policymaking
processes and not factual material, discovery should be ade-
quate to acquire the relevant evidence of falsehood.  A public-
figure plaintiff will thus be able to redress attacks on his
reputation, and at the same time the editorial process will be
protected in all but the most necessary cases.

## IV

Applying these principles to the instant case is most dif-
ficult, since the five categories of objectionable discovery
inquiries formulated by the Court of Appeals are general, and
it is impossible to determine what specific questions are
encompassed within each category.  It would nevertheless
appear that four of the five categories concern respondents'
mental processes, and thus would not be covered by an
editorial privilege.  Only the fourth category—"Conversations
between Lando and Wallace about matter to be included or
excluded from the broadcast publication"—would seem to be
protected by a proper editorial privilege.  The Court of
Appeals noted, however, that respondents had already made
available to petitioner in discovery "the contents of pre-
telecast conversations between Lando and Wallace . . . ."
568 F. 2d, at 982 (Kaufman, C. J.).  Whether this constitutes
waiver of the editorial privilege should be determined in the
first instance by the District Court.  I would therefore, like the
Court of Appeals, remand this case to the District Court, but
would require the District Court to determine (a) whether
respondents have waived their editorial privilege; (b) if not,
whether petitioner Herbert can overcome the privilege through

---

[17] A plaintiff can make his prima facie showing as part of his motion
for an order compelling discovery under Fed. Rule Civ. Proc. 37, or at any
other appropriate time.

a prima facie showing of defamatory falsehood; and (c) if not, the proper scope and application of the privilege.

MR. JUSTICE STEWART, dissenting.

It seems to me that both the Court of Appeals and this Court have addressed a question that is not presented by the case before us. As I understand the constitutional rule of *New York Times Co.* v. *Sullivan,* 376 U. S. 254, inquiry into the broad "editorial process" is simply not relevant in a libel suit brought by a public figure against a publisher. And if such an inquiry is not relevant, it is not permissible. Fed. Rule Civ. Proc. 26 (b).

Although I joined the Court's opinion in *New York Times,* I have come greatly to regret the use in that opinion of the phrase "actual malice." For the fact of the matter is that "malice" as used in the *New York Times* opinion simply does not mean malice as that word is commonly understood. In common understanding, malice means ill will or hostility,[1] and the most relevant question in determining whether a person's action was motivated by actual malice is to ask "why." As part of the constitutional standard enunciated in the *New York Times* case, however, "actual malice" has nothing to do with hostility or ill will, and the question "why" is totally irrelevant.

Under the constitutional restrictions imposed by *New York Times* and its progeny, a plaintiff who is a public official or public figure can recover from a publisher for a defamatory statement upon convincingly clear proof of the following elements:

(1) the statement was published by the defendant,

(2) the statement defamed the plaintiff,

(3) the defamation was untrue, and

(4) the defendant knew the defamatory statement was untrue, or published it in reckless disregard of its truth or

---

[1] See Webster's New International Dictionary 1367 (2d ed. 1961).

falsity. *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (plurality opinion); *Ocala Star-Banner Co.* v. *Damron*, 401 U. S. 295; *Time, Inc.* v. *Pape*, 401 U. S. 279; *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265; *Greenbelt Coop. Pub. Assn.* v. *Bresler*, 398 U. S. 6; *St. Amant* v. *Thompson*, 390 U. S. 727; *Beckley Newspapers Corp.* v. *Hanks*, 389 U. S. 81; *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130; *Rosenblatt* v. *Baer*, 383 U. S. 75; *New York Times Co.* v. *Sullivan, supra.* Cf. *Time, Inc.* v. *Firestone*, 424 U. S. 448; *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323; *Letter Carriers* v. *Austin*, 418 U. S. 264; *Time, Inc.* v. *Hill*, 385 U. S. 374; *Linn* v. *Plant Guard Workers*, 383 U. S. 53.

The gravamen of such a lawsuit thus concerns that which was in fact published. What was *not* published has nothing to do with the case. And liability ultimately depends upon the publisher's state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it— not at all, in other words, upon actual malice as those words are ordinarily understood.

This is not the first time that judges and lawyers have been led astray by the phrase "actual malice" in the *New York Times* opinion. In *Greenbelt Coop. Pub. Assn.* v. *Bresler, supra,* another defamation suit brought by a public figure against a publisher, the trial judge instructed the jury that the plaintiff could recover if the defendant's publication had been made with malice, and that malice means "spite, hostility, or deliberate intention to harm." In reversing the judgment for the plaintiff, we said that this jury instruction constituted "error of constitutional magnitude." 398 U. S., at 10. Cf. *Letter Carriers* v. *Austin, supra,* at 281; *Rosenblatt* v. *Baer, supra,* at 83–84.

In the present case, of course, neither the Court of Appeals nor this Court has overtly committed the egregious error manifested in *Bresler.* Both courts have carefully enunciated the correct *New York Times* test. See 568 F. 2d 974, 985

(opinion of Oakes, J.), and *ante,* at 156–157. But each has then followed a false trail, explainable only by an unstated misapprehension of the meaning of *New York Times* "actual malice," to arrive at the issue of "editorial process" privilege. This misapprehension is reflected by numerous phrases in the prevailing Court of Appeals opinions: "a journalist's exercise of editorial control and judgment," "how a journalist formulated his judgments," "the editorial selection process of the press," "the heart of the editorial process," "reasons for the inclusion or exclusion of certain material." See 568 F. 2d 974, *passim.* Similar misapprehension is reflected in this Court's opinion by such phrases as "improper motive," "intent or purpose with which the publication was made," "ill will," and by lengthy footnote discussion about the spite or hostility required to constitute malice at common law. See *ante,* at 162 and 164.

Once our correct bearings are taken, however, and it is firmly recognized that a publisher's motivation in a case such as this is irrelevant, there is clearly no occasion for inquiry into the editorial process as conceptualized in this case. I shall not burden this opinion with a list of the 84 discovery questions at issue.[2] Suffice it to say that few if any of them

---

[2] The following are some random samples:

"Did you ever come to a conclusion that it was unnecessary to talk to Capt. Laurence Potter prior to the presentation of the program on February 4th?"

"Did you come to the conclusion that you did not want to have a filmed interview with Sgt. Carmon for the program?"

"When you prepared the final draft of the program to be aired, did you form any conclusion as to whether one of the matters presented by that program was Col. Herbert's view of the treatment of the Vietnamese?"

"Do you have any recollection of discussing with anybody at CBS whether that sequence should be excluded from the program as broadcast?"

"Prior to the publication of the Atlantic Monthly article, Mr. Lando, did you discuss that article or the preparation of that article with any representative of CBS?"

seem to me to come within even the most liberal construction of Fed. Rule Civ. Proc. 26 (b).[3]

By the time this case went to the Court of Appeals, the deposition of the respondent Lando alone had lasted intermittently for over a year and had filled 2,903 pages of transcript, with an additional 240 exhibits. The plaintiff had, in Chief Judge Kaufman's words, "already discovered what Lando knew, saw, said and wrote during his investigation." 568 F. 2d, at 984. That, it seems to me, was already more than sufficient.

In a system of federal procedure whose prime goal is "the just, speedy, and inexpensive determination of every action," [4] time-consuming and expensive pretrial discovery is burdensome enough, even when within the arguable bounds of Rule 26 (b). But totally irrelevant pretrial discovery is intolerable.

Like the Court of Appeals, I would remand this case to the District Court, but with directions to measure each of the proposed questions strictly against the constitutional criteria of *New York Times* and its progeny. Only then can it be determined whether invasion of the editorial process is truly threatened.

MR. JUSTICE MARSHALL, dissenting.

Although professing to maintain the accommodation of interests struck in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), the Court today is unresponsive to the constitutional considerations underlying that opinion. Because I believe that some constraints on pretrial discovery are essential to ensure the "uninhibited [and] robust" debate on public

---

[3] Rule 26 (b) (1) provides in relevant part:

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

[4] Fed. Rule Civ. Proc. 1.

issues which *Sullivan* contemplated, *id.*, at 270, I respectfully dissent.

## I

At issue in this case are competing interests of familiar dimension. States undeniably have an interest in affording individuals some measure of protection from unwarranted defamatory attacks. Libel actions serve that end, not only by assuring a forum in which reputations can be publicly vindicated and dignitary injuries compensated, but also by creating incentives for the press to exercise considered judgment before publishing material that compromises personal integrity. See *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 341–342 (1974); *Rosenblatt* v. *Baer,* 383 U. S. 75, 86 (1966).

Against these objectives must be balanced society's interest in promoting unfettered debate on matters of public importance. As this Court recognized in *Sullivan,* error is inevitable in such debate, and, if forced to guarantee the truth of all assertions, potential critics might suppress statements believed to be accurate "because of doubt whether [truthfulness] can be proved in court or fear of the expense of having to do so." 376 U. S., at 279. Such self-censorship would be incompatible with the tenets on which the First Amendment and our democratic institutions are founded. Under a representative system of government, an informed electorate is a precondition of responsive decisionmaking. See *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936); A. Meiklejohn, Free Speech and its Relation to Self-Government 88–89 (1948). To secure public exposure to the widest possible range of information and insights, some margin of error must be tolerated. Thus, absent knowing falsity or reckless disregard for the truth, the press is shielded from liability for defamatory statements regarding public figures. *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967); *New York Times Co.* v. *Sullivan, supra.*

Yet this standard of liability cannot of itself accomplish the ends for which it was conceived. Insulating the press from ultimate liability is unlikely to avert self-censorship so long as any plaintiff with a deep pocket and a facially sufficient complaint is afforded unconstrained discovery of the editorial process. If the substantive balance of interests struck in *Sullivan* is to remain viable, it must be reassessed in light of the procedural realities under which libel actions are conducted.

## II

The potential for abuse of liberal discovery procedures is of particular concern in the defamation context. As members of the bench and bar have increasingly noted, rules designed to facilitate expeditious resolution of civil disputes have too often proved tools for harassment and delay.[1] Capitalizing on this Court's broad mandate in *Hickman* v. *Taylor*, 329 U. S. 495, 507 (1947), reaffirmed in *Schlagenhauf* v. *Holder*, 379 U. S. 104, 114–115 (1964), that discovery rules be accorded a "broad and liberal" scope, litigants have on occasion transformed Fed. Rule Civ. Proc. 26 devices into tactics of attrition. The possibility of such abuse is enhanced in libel litigation, for many self-perceived victims of defamation are animated by something more than a rational calculus of their chances of recovery.[2] Given the circumstances under which

---

[1] See Bell, The Pound Conference Follow-up: A Response from the United States Department of Justice, 76 F. R. D. 320, 328–329 (1978); Erikson, The Pound Conference Recommendations: A Blueprint for the Justice System in the Twenty-First Century, 76 F. R. D. 277, 288–290 (1978); Lasker, The Court Crunch: A View from the Bench, 76 F. R. D. 245, 252 (1978); A. B. A. Litigation Section, Report of the Special Committee for the Study of Discovery Abuse (Oct. 1977); Stanley, President's Page, 62 A. B. A. J. 1375 (1976); Burger, Agenda for 2000 A. D.—A Need for Systematic Anticipation, 70 F. R. D. 83, 95–96 (1976); 4 J. Moore, Federal Practice ¶ 26.02 [3] (2d ed. 1976).

[2] See Anderson, Libel and Press Self-Censorship, 53 Texas L. Rev. 422, 435 (1975).

libel actions arise, plaintiffs' pretrial maneuvers may be fashioned more with an eye to deterrence or retaliation than to unearthing germane material.

Not only is the risk of *in terrorem* discovery particularly pronounced in the defamation context, but the societal consequences attending such abuse are of special magnitude. Rather than submit to the intrusiveness and expense of protracted discovery, even editors confident of their ability to prevail at trial or on a motion for summary judgment may find it prudent to " 'steer far wid[e] of the unlawful zone' thereby keeping protected discussion from public cognizance." *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 53 (1971) (plurality opinion; citation omitted). Faced with the prospect of escalating attorney's fees, diversion of time from journalistic endeavors, and exposure of potentially sensitive information, editors may well make publication judgments that reflect less the risk of liability than the expense of vindication.[3]

Although acknowledging a problem of discovery abuse, the Court suggests that the remedy lies elsewhere, in "major changes in the present Rules of Civil Procedure." *Ante,* at 177. And somewhat inconsistently, the Court asserts further that district judges already have "in fact and in law . . . ample powers . . . to prevent abuse." *Ibid.* I cannot agree. Where First Amendment rights are critically implicated, it is incumbent on this Court to safeguard their effective exercise. By leaving the directives of *Hickman* and *Schlagenhauf* unqualified with respect to libel litigation, the Court has abdicated that responsibility.[4]

---

[3] As the facts of the instant case illustrate, that expense can be considerable. The deposition of Lando alone consumed 26 days and close to 3,000 pages of transcript. See 568 F. 2d 974, 982 (CA2 1977).

[4] Although the separate opinions of my Brothers POWELL and STEWART display greater solicitude for First Amendment values than does the opinion for the Court, I believe that they too elide the critical issue presented by this case. Under the "broad and liberal" standard of *Hickman,* surely

In my judgment, the same constitutional concerns that impelled us in *Sullivan* to confine the circumstances under which defamation liability could attach also mandate some constraints on roving discovery. I would hold that the broad discovery principles enunciated in *Hickman* and *Schlagenhauf* are inapposite in defamation cases. More specifically, I would require that district courts superintend pretrial disclosure in such litigation so as to protect the press from unnecessarily protracted or tangential inquiry. To that end, discovery requests should be measured against a strict standard of relevance. Further, because the threat of disclosure may intrude with special force on certain aspects of the editorial process, I believe some additional protection in the form of an evidentiary privilege is warranted.

### III

The Court of Appeals extended a privilege subsuming essentially two kinds of discovery requests. The first included questions concerning the state of mind of an individual journalist, principally his conclusions and bases for conclusions as to the accuracy of information compiled during investigation. The second encompassed communications between journalists about matter to be included in the broadcast. 568 F. 2d 974, 978 (CA2 1977). Reasoning that discovery of both forms of material would be intrusive, that the intrusion would be inhibiting, and that such inhibition would be inconsistent with

---

disclosure of what was known to a journalist but "was *not* published," *ante,* at 200 (opinion of STEWART, J.), will often be germane to whether that individual proceeded with deliberate or reckless disregard for the truth. And admonishing district courts to monitor discovery in the "interest of justice," *ante,* at 180 (opinion of POWELL, J.) or to prevent "undue burden or expense," *ibid.,* adds little to the guidance already afforded by Rule 26 and cannot adequately mitigate the burdens on the press so long as *Hickman*'s directive remains in force. Moreover, neither opinion is directly responsive to the effect of discovery on editorial discussion. See *infra,* at 208–209.

the editorial autonomy recognized in *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), and *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973), the Court of Appeals concluded that a privilege from disclosure was essential.   568 F. 2d, at 975.

With respect to state-of-mind inquiry, that syllogism cannot withstand analysis.   For although discovery may well be intrusive, it is unclear how journalists faced with the possibility of such questions can be "chilled in the very process of thought."   *Id.,* at 984.   Regardless of whether strictures are placed on discovery, reporters and editors must continue to think, and to form opinions and conclusions about the veracity of their sources and the accuracy of their information.   At best, it can be argued only that failure to insulate the press from this form of disclosure will inhibit not the editing process but the final product—that the specter of questions concerning opinion and belief will induce journalists to refrain from publishing material thought to be accurate.   But as my Brother BRENNAN notes, *ante,* at 192–193, this inhibition would emanate principally from *Sullivan's* substantive standard, not from the incremental effect of such discovery.   So long as *Sullivan* makes state of mind dispositive, some inquiry as to the manner in which editorial decisions are made is inevitable. And it is simply implausible to suppose that asking a reporter why certain material was or was not included in a given publication will be more likely to stifle incisive journalism than compelling disclosure of other objective evidence regarding that decision.[5]

---

[5] Respondents in this case produced a considerable amount of evidence regarding preparation of the broadcast:

"Lando answered innumerable questions about what he knew, or had seen; whom he interviewed; intimate details of his discussions with interviewees; and the form and frequency of his communications with sources.   The exhibits produced included transcripts of his interviews; volumes of reporters notes; videotapes of interviews; and a series of drafts of the '60

I do not mean to suggest, as did the District Court here, that *Tornillo* and *Columbia Broadcasting* have "nothing to do" with this case. 73 F. R. D. 387, 396 (SDNY 1977). To the contrary, the values of editorial autonomy given recognition in those decisions should inform district courts as they monitor the discovery phase of defamation cases. But assuming that a trial judge has discharged his obligation to prevent unduly protracted or inessential disclosure, see *supra,* at 206, I am unpersuaded that the impact of state-of-mind inquiry will of itself threaten journalistic endeavor beyond the threshold contemplated by *Sullivan.*

External evidence of editorial decisionmaking, however, stands on a different footing. For here the concern is not simply that the ultimate product may be inhibited, but that the process itself will be chilled. Journalists cannot stop forming tentative hypotheses, but they can cease articulating them openly. If prepublication dialogue is freely discoverable, editors and reporters may well prove reluctant to air their

---

Minutes' telecast. Herbert also discovered the contents of pre-telecast conversations between Lando and Wallace as well as reactions to documents considered by both." 568 F. 2d, at 982 (footnote omitted).

As an abstract proposition, it is not self-evident why disclosure of this material, for which no privilege was sought, would be less likely to inhibit the final publication than state-of-mind inquiries, which in most cases would presumably elicit self-serving responses. Indeed, as the Court acknowledges, plaintiffs may "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." *Ante,* at 170.

Thus, I seriously doubt that state-of-mind questions will substantially "increase the likelihood of large damages judgments in libel actions." *Ante,* at 191 (opinion of BRENNAN, J.). But neither can it be disputed that such questions might on occasion generate answers useful to plaintiffs in defamation suits. See, *e. g., Davis* v. *Schuchat,* 166 U. S. App. D. C. 351, 355–356, 510 F. 2d 731, 735–736 (1975); *Goldwater* v. *Ginzburg,* 414 F. 2d 324, 334–335 (CA2 1969), cert. denied, 396 U. S. 1049 (1970); *Varnish* v. *Best Medium Publishing Co.,* 405 .F. 2d 608, 612 (CA2 1968), cert. denied, 394 U. S. 987 (1969).

reservations or to explore other means of presenting information and comment. The threat of unchecked discovery may well stifle the collegial discussion essential to sound editorial dynamics. As we recognized in *United States* v. *Nixon,* 418 U. S. 683, 705 (1974): "[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." (Footnote omitted.) Cf. *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 151 (1975). Society's interest in enhancing the accuracy of coverage of public events is ill-served by procedures tending to muffle expression of uncertainty. To preserve a climate of free interchange among journalists, the confidentiality of their conversation must be guaranteed.

It is not enough, I believe, to accord a discovery privilege that would yield before any plaintiff who can make a prima facie showing of falsity. See *ante,* at 197–198 (opinion of BRENNAN, J.). Unless a journalist knows with some certitude that his misgivings will enjoy protection, they may remain unexpressed. See 568 F. 2d, at 994 (Oakes, J., concurring). If full disclosure is available whenever a plaintiff can establish that the press erred in some particular, editorial communication would not be demonstrably less inhibited than under the Court's approach. And by hypothesis, it is precisely those instances in which the risk of error is significant that frank discussion is most valuable.

Accordingly, I would foreclose discovery in defamation cases as to the substance of editorial conversation.[6] Shielding

---

[6] Contrary to the Court's intimation, *ante,* at 165, 169–170, this would not be the first instance in which protection apart from the *Sullivan* malice standard has been extended to safeguard the constitutional interests implicated in libel suits. For example, lower courts have displayed sensitivity to First Amendment values in assessing motions to compel disclosure of confidential sources, see *Cervantes* v. *Time, Inc.,* 464 F. 2d 986, 992–994 (CA8 1972), cert. denied, 409 U. S. 1125 (1973), and motions by defendants for summary judgment. See *Washington Post Co.* v. *Keogh,* 125 U. S.

this limited category of evidence from disclosure would be unlikely to preclude recovery by plaintiffs with valid defamation claims. For there are a variety of other means to establish deliberate or reckless disregard for the truth, such as absence of verification, inherent implausibility, obvious reasons to doubt the veracity or accuracy of information, and concessions or inconsistent statements by the defendant. See *St. Amant* v. *Thompson,* 390 U. S. 727, 732 (1968). To the extent that such a limited privilege might deny recovery in some marginal cases, it is, in my view, an acceptable price to pay for preserving a climate conducive to considered editorial judgment.

I would therefore direct the Court of Appeals to remand this case to the District Court for determination first, whether the questions concerning Lando's state of mind satisfy the criteria set forth in Part II of this opinion, and second, whether respondents waived the privilege defined in Part III for prepublication discussions.

---

App. D. C. 32, 34–35, 365 F. 2d 965, 967–968 (1966), cert. denied, 385 U. S. 1011 (1967).

Different considerations would, of course, obtain if a privilege for editorial communications were sought in conjunction with criminal proceedings. Cf. *New York Times Co.* v. *Jascalevich,* 439 U. S. 1331 (1978) (MARSHALL, J., in chambers); *United States* v. *Nixon,* 418 U. S. 683, 712–713 (1974); *Branzburg* v. *Hayes,* 408 U. S. 665 (1972); *id.,* at 741–743 (STEWART, J., dissenting).