FILED
United States Court of Appeals
Tenth Circuit

May 20, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ASHLEY REGAN-TOUHY,
an individual,

     Plaintiff-Appellant,

v.

WALGREEN COMPANY,
a foreign corporation,

     Defendant-Appellee.

No. 06-6242

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CV-05-135-VML)**

---

Tony Gould (Ryan Leonard with him on the briefs), of Leonard & Gould, PLLC, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Robert D. Looney, Jr., of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee.

---

Before **HARTZ** and **GORSUCH**, Circuit Judges, and **BRIMMER**,[*] District Judge.

---

**GORSUCH**, Circuit Judge.

---

[*] The Honorable Clarence A. Brimmer, United States District Judge for the District of Wyoming, sitting by designation.

Ashley Regan-Touhy claims that Kim Whitlock, a former Walgreen pharmacy technician, used her position to access Ms. Touhy's pharmacy records and then disclosed the contents of those records to Ms. Touhy's ex-husband, among others. Asserting diversity jurisdiction, Ms. Touhy sued Walgreen, alleging it is liable for the unlawful disclosure of her confidential medical information, as well as for the emotional distress that disclosure caused her. At the close of discovery, Ms. Touhy asked the court to compel Walgreen to produce materials that Ms. Touhy hoped would include evidence pointing to Ms. Whitlock as the source of the leaked information. The district court denied the motion and granted summary judgment in favor of Walgreen. On appeal, Ms. Touhy challenges both decisions. Because the district court acted within its discretion in finding Ms. Touhy's discovery requests overly broad or adequately answered, and because the district court correctly determined that no admissible evidence could provide a basis for a reasonable jury to conclude that Ms. Whitlock had disclosed Ms. Touhy's health information, we affirm.

I

A

In November 2003, Ms. Touhy learned she had a case of genital herpes. While seeking to keep this private information private, somehow the news became widely known in Ms. Touhy's local community of Edmond, Oklahoma, and

- 2 -

eventually made its way to her ex-husband, Bryan Abrams. Distressed that her diagnosis was the subject of local gossip, Ms. Touhy sought to determine how it became public and eventually surmised that Ms. Whitlock was the source.[1]

How Ms. Touhy reached this conclusion is part of a larger story. After receiving her diagnosis from a doctor at a Planned Parenthood clinic, Ms. Touhy filled a prescription for Valtrex, an antiviral drug principally used to treat herpes, at her local Walgreen pharmacy in late 2003. She revealed her diagnosis to only a few close friends and family. Even so, around the beginning of February 2004, Ms. Touhy received a phone call in the middle of the night from Mr. Abrams, whom she had recently divorced after three years of marriage. During this conversation, Mr. Abrams, apparently intoxicated and belligerent, claimed that he knew about Ms. Touhy's condition and expressed concern about whether she had also infected him. Ms. Touhy denied that she had herpes and demanded that Mr. Abrams tell her where he had heard otherwise. Mr. Abrams replied that someone at Planned Parenthood leaked the information.

Several days later, the two spoke again. During the call, Ms. Touhy again denied that she had herpes and pressed Mr. Abrams to reveal his source contending otherwise. Mr. Abrams initially refused to name any particular

---

[1] Because this case concerns the wrongful disclosure of private health information, it unavoidably involves discussion of information that was intended to be kept private but which no longer is and which, by necessity, is recounted in Ms. Touhy's complaint and pleadings, the district court's decision, and here as well.

person, saying only that his source had been informed by someone at Planned Parenthood, and that the person at Planned Parenthood "does not like [Ms. Touhy]." R. at 61. When pressed, however, Mr. Abrams told Ms. Touhy that his source was Shannon Flowers, an acquaintance of his. *Id.* Mr. Abrams represented that Ms. Flowers heard the information from someone at Planned Parenthood, but that he did not know who the source at Planned Parenthood was. Throughout the conversation, Ms. Touhy asked whether Kim Frazier, Mr. Abrams's girlfriend both before and after his marriage to Ms. Touhy, was involved in any way. Mr. Abrams told Ms. Touhy that Ms. Frazier had nothing to do with how he found out about Ms. Touhy's diagnosis.

Despite Mr. Abrams's assurances that Ms. Frazier was not involved in disseminating news of Ms. Touhy's health condition, Ms. Touhy continued to harbor suspicions. Adding fuel to the fire, Ms. Touhy and Ms. Frazier exchanged a number of hostile email messages in August 2004. In one message, Ms. Frazier disparaged Ms. Touhy for having contracted herpes. *See id.* at 100.

Late in 2004, Mr. Abrams and Ms. Touhy spoke again – and for the first time since their conversations in February. Asked once more to reveal how he heard the news of Ms. Touhy's diagnosis, Mr. Abrams now claimed that his source was indeed Ms. Frazier, and that Ms. Frazier received the information not from someone at Planned Parenthood, but from her friend Kim Whitlock, who worked as a pharmacy technician for Walgreen in nearby Oklahoma City –

though, as best we can tell from the record, not in the same store where Ms. Touhy filled her prescription.

B

With this information in hand, and on the theory that Ms. Whitlock had used her position to access and divulge Ms. Touhy's private health information, Ms. Touhy brought suit against Walgreen in February 2005, alleging intentional infliction of emotional distress, breach of duty of confidentiality, invasion of privacy, and disclosure of confidential medical information (the last count a violation of Okla. Stat. title 63 § 1-502.2(H)). Discovery ensued.

During his deposition, Mr. Abrams offered yet another account of how he learned of Ms. Touhy's condition, this time testifying that his source was his friend Ernie Calderon, someone who shared mutual friends with Ms. Touhy. Mr. Abrams further testified that, in addition to Mr. Calderon, other acquaintances told him during a conversation at a bar that Ms. Touhy had contracted herpes. According to Mr. Abrams, he invented the stories involving Planned Parenthood and Walgreen only because Ms. Touhy kept denying that she had herpes; Mr. Abrams believed she would be more forthcoming if she thought he had reliable information rather than mere rumor and, Mr. Abrams explained, it was important to him to find out when and how Ms. Touhy contracted herpes in order to determine if he was at risk.

In her deposition, Ms. Whitlock admitted that she knew Mr. Abrams and that she was friends with Ms. Frazier. Ms. Whitlock also admitted that, as a pharmacy technician for Walgreen, she could have accessed Ms. Touhy's prescription information so long as she had Ms. Touhy's name and area code. Ms. Whitlock insisted, however, that she never accessed Ms. Touhy's records and never revealed such information to Ms. Frazier, Mr. Abrams, or anyone else.

Ms. Touhy also issued various interrogatories and document requests seeking evidence to substantiate her hypothesis about Ms. Whitlock's involvement. Among these requests, a handful still remain the subject of dispute at this advanced stage in the proceedings. They include Ms. Touhy's request for "log files" or other documents capable of identifying which employees had accessed Ms. Touhy's pharmacy account information (Doc. Requests 10-12). They also include a request that Walgreen "[i]dentify each person(s) who have assisted in the designing, maintenance and/or operation of any computer system that houses Plaintiff's records" (Interrog. 10), as well as a request for the production of "all manuals concerning any computer system or program" that housed information about Ms. Touhy (Doc. Request 14). The challenged requests further include Ms. Touhy's demand for production of: Ms. Whitlock's personnel file (Doc. Request 4); "all communications between [Walgreen] and Whitlock" (Doc. Request 8); all email from Ms. Whitlock's corporate email account (Doc. Request 9); and "all documents . . . that relate in any way to Plaintiff, Whitlock or

- 6 -

the litigation or the alleged facts and circumstances concerning the litigation" (Doc. Request 6).

Walgreen objected to these discovery requests on various grounds, including that they were overly broad and not reasonably calculated to lead to the discovery of admissible evidence. The company nevertheless chose to produce some materials in response to the challenged requests, including (1) a copy of Ms. Touhy's prescription; (2) sixteen pages of "purged data" from the Walgreen computer system, listing transactions and prescription information for Ms. Touhy at various Walgreen stores dating back to 2000; (3) Ms. Touhy's "Confidential Patient Information Prescription Profile," which also listed the prescriptions Ms. Touhy had filled at Walgreen stores; and (4) screen prints of the patient information displayed when Ms. Touhy's patient account was accessed on Walgreen's computer system. While many of these documents show the initials of various pharmacists who filled Ms. Touhy's prescriptions and other employees who conducted transactions on those prescriptions, Ms. Whitlock's initials do not appear anywhere among them.

C

In due course, Walgreen moved for summary judgment, arguing that the only putative evidence suggesting that Ms. Whitlock had disclosed Ms. Touhy's private health information was inadmissible hearsay: Ms. Touhy's testimony that Mr. Abrams told her that Ms. Frazier told him that Ms. Whitlock told Ms. Frazier

about Ms. Touhy's condition.  Without some other (competent) evidence pointing to a wrongful disclosure by Ms. Whitlock or Walgreen, Walgreen argued that summary judgment should be entered.

Before the district court could rule on Walgreen's motion for summary judgment, Ms. Touhy filed a motion to compel, challenging the adequacy of Walgreen's responses to her discovery requests.   In separate orders, the district court denied Ms. Touhy's motion to compel and granted Walgreen's motion for summary judgment.  With respect to the discovery motion, the district court found that Walgreen's productions constituted an adequate response to most of Ms. Touhy's requests and held that virtually all of the contested requests were overly broad.  With respect to the motion for summary judgment, the district court agreed with Walgreen that Ms. Touhy's case rested on inadmissible hearsay insufficient to establish a triable question for a jury.  In this appeal, Ms. Touhy challenges both the district court's denial of her motion to compel and its order granting summary judgment in favor of Walgreen.  We address each in turn.

II

We review a district court's discovery rulings, including the denial of a motion to compel, for abuse of discretion.  *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1300 (10th Cir. 1999).  Under this standard, we will reverse a district court only if it "exceeded the bounds of permissible choice, given the facts and applicable law in the case at hand."  *United States v. McComb*, 519 F.3d

1049, 1053 (10th Cir. 2007) (internal quotation omitted). Generally, a district court "exceed[s] the bounds of permissible choice," only when its "decision is either based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Id.* at 1053-54 (internal quotation omitted). In the discovery context, the range of permissible choices available to the district court is notably broad. This is so because discovery decisions necessarily involve an assessment of the anticipated burdens and benefits of particular discovery requests in discrete factual settings, while at the same time also requiring the trial judge to take account of the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the ability of the proposed discovery to shed light on those issues, among many other things. *See* Fed. R. Civ. P. 26(b)(2)(C); s*ee also, e.g.*, *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1449-50 (10th Cir. 1993); *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 591 (10th Cir. 2007). Because few discovery matters are case dispositive and because there is more than one way to skin the discovery cat – getting at needed information through so many different modes, whether document requests, interrogatories, depositions, third party subpoenas, or requests for admission, to name but a few – by the time discovery disputes arrive in our court, "it is difficult at that stage to show that the party has been prejudiced by" any particular discovery order. Wright & Miller, 8 Federal Practice and

Procedure § 2006, at 91.  Even so, Ms. Touhy argues that she meets our high standard for reversal in several ways.

*First*, Ms. Touhy attacks the district court's factual finding that Walgreen provided all relevant "access logs" related to her pharmacy account from the Walgreen computer system, sought as part of Doc. Requests 10-12.  To be more precise, Ms. Touhy does not appear to dispute that Walgreen produced records identifying those employees who conducted *transactions* on Ms. Touhy's account; instead, at this stage she complains only that the company has not produced logs showing which employees merely *viewed* her electronic pharmacy records.  The district court's finding that Walgreen's production was complete rested on an affidavit from Adam Weiner, a member of Walgreen's technology support group, who attested that the company's pertinent computer systems at the time in question generated logs tracking only those who conducted transactions on, rather than merely viewed, pharmacy accounts.  Ms. Touhy challenges the district court's finding by pointing us to statements from another Walgreen employee, Michael Simko, before the National Committee on Vital and Health Statistics.  Those statements, however, do not expressly contradict Mr. Weiner's testimony and were made in a different proceeding and context.  More fundamentally still, Ms. Touhy failed to present Mr. Simko's statement to the district court in connection with her motion to compel, despite the fact it was available to her at

the time.[2]  We generally limit our review on appeal to the record that was before

the district court when it made its decision, *see Boone v. Carlsbad Bancorp., Inc.*,

972 F.2d 1545, 1549 n.1 (10th Cir. 1992) ("[w]e will not review [evidence that]

was not before the district court when the various rulings at issue were made"),

and on that record we cannot say that the district court clearly erred in finding

that Walgreen fully produced the access logs it had.

*Second*, Ms. Touhy contests the district court's determination that

Document Request 14 and Interrogatory 10 were overly broad.  The former

demanded production of *all* manuals for *any* Walgreen's computer systems and

programs that might house information about Ms. Touhy; the latter asked

Walgreen to identify *every* person involved in the design and maintenance of

those systems.  On appeal, however, Ms. Touhy does not attempt to defend these

requests as written.  Rather, she now seeks only *a* (recent) computer manual and

only *one* person with knowledge of the Walgreen computer system.

Unfortunately, both Ms. Touhy's actual request and her motion to compel before

the district court did not make any mention of such limitations, and we cannot say

the district court exceeded the bounds of permissible choice in denying

---

[2]  Ms. Touhy first presented the Simko statement to the district court only
in connection with a distinct and subsequent motion to continue the trial date.
She never sought to have the testimony considered in connection with her motion
to compel.

enforcement of requests that Ms. Touhy then sought to enforce but does not now seek to defend.[3]

*Third*, Ms. Touhy contends that the district court abused its discretion in refusing to enforce Document Request 4, seeking Ms. Whitlock's personnel file, which Ms. Touhy argues may reveal that Walgreen disciplined Ms. Whitlock for disclosing private health information.[4] While the district court considered this request overly broad, Ms. Touhy contends that Walgreen never objected to her request on that basis and so, she reasons, the district court erred in denying her motion to compel.

The major premise of this argument is faulty. Walgreen's discovery responses included a general objection that all of Ms. Touhy's document requests were overly broad, as well as a specific objection that the personnel file request was not reasonably calculated to lead to the discovery of admissible evidence.

---

[3] Of course, had Ms. Touhy narrowed her request before the district court when seeking enforcement, we might have a different case. It is worth noting, too, that Walgreen *did* identify one person who could testify concerning the Walgreen computer system – Adam Weiner – and Ms. Touhy was apparently aware of another – Michael Simko.

[4] Specifically, Ms. Touhy asserts that, shortly after this lawsuit was filed, Ms. Whitlock was "sudden[ly] transferred" and that her employment was terminated a month later. Walgreen vehemently disputes this account, submitting that Ms. Whitlock actually received a promotion to an administrative position at Walgreen corporate offices, but then left for a better paying job elsewhere. We need not decide what became of Ms. Whitlock; for purposes of our decision we, like the district court, proceed on the assumption that the file would contain information likely to lead to the discovery of admissible evidence.

The district court agreed with Walgreen, and we cannot gainsay its conclusion: personnel files often contain sensitive personal information, just as pharmacy files do, and it is not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly. Indeed, the Supreme Court has underscored that "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery [to protect] 'a party or person from annoyance, embarrassment, [or] oppression . . . .'" *Herbert v. Lando*, 441 U.S. 153, 177 (1979) (quoting Fed. R. Civ. P. 26(c)(1)); *see also Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994) (no abuse of discretion where "privacy interests, coupled with [the district court's] determination to keep the trial focused . . . , justified limiting [plaintiff's discovery of] personnel files"). This is not to say personnel files are categorically out-of-bounds. By way of example only, had Ms. Touhy issued a more narrowly targeted request focused only on documents (whether from the personnel file or elsewhere) that might indicate disciplinary action against Ms. Whitlock after Ms. Touhy filed suit, we would face a very different question. But the district court had to assess the discovery request Ms. Touhy put before it for decision, and we cannot say that the court exceeded its discretion in finding that request overly broad.

*Fourth*, for similar reasons, we perceive no abuse of discretion in the district court's holding that Ms. Touhy's requests for "all communications

- 13 -

between [Walgreen] and Whitlock" (Doc. Request 8) and "all email from Whitlock's Walgreen's email account" (Doc. Request 9) were overbroad. Rather than being tailored to ascertaining whether Walgreen disciplined Ms. Whitlock for (allegedly) disclosing Ms. Touhy's condition – the information Ms. Touhy says she wanted to discover – these requests cast a much wider net, encompassing much information irrelevant to that stated purpose, of a potentially personal nature, or protected by attorney-client privilege. *See* Fed. R. Civ. P. 26(c)(1); *Herbert*, 441 U.S. at 177; *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly"); Manual for Complex Litigation § 11.443, at 75 (encouraging courts to "forbid sweeping requests" and to "direct counsel to frame requests for production of the fewest documents possible"). Further, the burdens and costs associated with electronic discovery, such as those seeking "all email," are by now well known, and district courts are properly encouraged to weigh the expected benefits and burdens posed by particular discovery requests (electronic and otherwise) to ensure that collateral discovery disputes do not displace trial on the merits as the primary focus of the parties' attention.[5]

*Finally*, we agree with the district court that Document Request 6, seeking from Walgreen "all documents . . . that refer to, mention or relate in any way to

---

[5] *See, e.g.*, Fed. R. Civ. P. 26(b)(2)(B) & (C); The Sedona Conference, The Sedona Principles: Second Edition (2007); Institute for the Advancement of the American Legal System, Navigating the Hazards of E-Discovery (2007).

Plaintiff, Whitlock, or the litigation or the allegations, facts and circumstances concerning the litigation," is overly broad.  Under our rules, parties to civil litigation are given broad discovery privileges.  But with those privileges come certain modest obligations, one of which is the duty to state discovery requests with "reasonable particularity."  Fed. R. Civ. P. 34(b)(1)(A).  All-encompassing demands of this kind take little account of that responsibility.  Though what qualifies as "reasonabl[y] particular" surely depends at least in part on the circumstances of each case, a discovery request should be sufficiently definite and limited in scope that it can be said "to apprise a person of ordinary intelligence what documents are required and [to enable] the court . . . to ascertain whether the requested documents have been produced."  Wright & Miller, 8A Federal Practice and Procedure § 2211, at 415.  We cannot disagree with the district court that Ms. Touhy's kitchen sink request failed to meet this standard.  *See id*. at 416-17 n.16 (collecting cases involving similar requests held to be overbroad); Manual for Complex Litigation § 11.443, at 75 ("In overseeing document production, the court should . . . prevent indiscriminate, overly broad, or unduly burdensome demands . . . such as those for 'all documents relating or referring to' a . . . claim . . . .").[6]

---

[6] Of course, the district court was free to and could have chosen to work with the parties to narrow this or other of Ms. Touhy's discovery requests to the point that they were no longer overbroad.  But, at the end of the day, it is the parties' obligation to frame their own discovery requests and to seek to narrow

(continued...)

III

Turning to Ms. Touhy's appeal of the district court's entry of summary judgment, the parties agree that all of Ms. Touhy's claims against Walgreen hinge on establishing that Ms. Whitlock used her position as a Walgreen employee to access and then disclose Ms. Touhy's health information. The dispositive question before us, then, is whether, viewing the facts in the light most favorable to Ms. Touhy as the non-movant, a reasonable jury could conclude that Ms. Whitlock acted in such a way. Ms. Touhy presents two theories why we should answer this question affirmatively.

*First*, Ms. Touhy contends that her own testimony suffices to raise a triable question of fact. At deposition, Ms. Touhy repeated her claim that Mr. Abrams told her that he learned of her health condition from Ms. Frazier, who in turn heard the information from Ms. Whitlock. As the district court rightly observed, however, Ms. Touhy has a serious hearsay problem. Neither Mr. Abrams, Ms. Frazier, nor Ms. Whitlock have testified that Ms. Whitlock *actually* accessed and then disclosed Ms. Touhy's health information to Ms. Frazier, and so evidence of Ms. Whitlock's alleged statement comes to the court only by way of a three-link chain: Ms. Touhy's testimony of (1) what Mr. Abrams allegedly told her that

_____

[6](...continued)
any disputes with opposing counsel; the district court is obliged only to rule on the requests for enforcement or protection eventually presented to it, not to do the parties' work for them by editing discovery requests until they comply with the Federal Rules of Civil Procedure.

(2) Ms. Frazier told him about (3) what Ms. Frazier heard from Ms. Whitlock. For hearsay within hearsay to be admitted as evidence, a hearsay exception must apply to each link of the chain. *See* Fed. R. Evid. 805. Even assuming without deciding that the link comprising Ms. Whitlock's alleged statement to Ms. Frazier might be non-hearsay as a party-opponent admission, Fed. R. Evid. 801(d)(2),[7] Ms. Touhy has failed to point to any hearsay exceptions for the other segments of the chain, and we likewise discern none.

Ms. Touhy argues that Ms. Whitlock's alleged statement should be considered nonetheless because it could conceivably be admitted at trial to impeach Mr. Abrams in the event he testifies that Ms. Whitlock was not his source of information. But a prior statement offered for impeachment purposes is admissible only to show that the speaker is not worthy of belief; it is not received for the truth of the matter asserted. *See United States v. Carter*, 973 F.2d 1509, 1512 (10th Cir. 1992) ("A witness' prior statements are admissible only to impeach or discredit the witness and are not competent substantive evidence of

---

[7] Because Walgreen, rather than Ms. Whitlock, is Ms. Touhy's opposing party in this matter, Ms. Whitlock's statements would qualify as a non-hearsay party-opponent admission only if: Walgreen manifested an adoption or belief in the truth of Ms. Whitlock's alleged statement; Walgreen had specifically authorized Ms. Whitlock to make statements concerning Ms. Touhy's health condition; making statements concerning Ms. Touhy's health condition was otherwise a matter within the scope of Ms. Whitlock's employment with Walgreen; or Ms. Whitlock's statement was made in furtherance of a conspiracy in which Walgreen and Ms. Whitlock were co-conspirators. Fed. R. Evid. 801(d)(2)(B)-(E).

the facts to which the former statements relate.") (internal quotation omitted).[8] The particulars of this case demonstrate the wisdom of that rule: of the various stories Mr. Abrams told at one point or another, Ms. Touhy would like the jury to believe the one that implicates Ms. Whitlock but offers no reason why that version of events is any more persuasive or credible than the others.[9]

*Second*, even putting aside the proffered hearsay statement, Ms. Touhy submits that there is sufficient circumstantial evidence in the record for her claims to survive summary judgment. Among other things, Ms. Touhy notes, the record establishes that: Ms. Whitlock and Ms. Frazier were good friends; Ms. Frazier was Mr. Abrams's girlfriend; Ms. Frazier herself knew about Ms. Touhy's condition (as revealed by her hostile email); Mr. Abrams knew Ms. Whitlock independently because he previously worked with Ms. Whitlock's husband and had rented a house from Mr. Whitlock's grandmother; and Ms. Whitlock testified

---

[8] *See also United States v. Grant*, 256 F.3d 1146, 1156 (11th Cir. 2001) ("[T]he point of admitting inconsistent statements to impeach is not to show that they are true, but to aid the jury in deciding whether the witness is credible."); *United States v. Graham*, 858 F.2d 986, 990 n.5 (5th Cir. 1988) ("[T]he hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement . . . is not offered for the truth of the matter asserted; rather, it is offered only to establish that the witness has said both 'x' and 'not x' and is therefore unreliable.").

[9] We of course acknowledge that, pursuant to Fed. R. Evid. 801(d)(1)(A), prior inconsistent statements made under oath are not considered hearsay and may be admitted both for impeachment purposes and substantive consideration where the declarant is subject to cross-examination concerning the statement. *See United States v. Orr*, 864 F.2d 1505, 1509 (10th Cir. 1988). Mr. Abrams's statement to Ms. Touhy, however, was not made under oath.

that she knew Mr. Abrams told Ms. Touhy that Ms. Whitlock was his source. Ms. Touhy contends that these facts, taken together, suggest that Ms. Whitlock was the only person with both access to Ms. Touhy's medical information and motivation to disclose that information to Mr. Abrams.

As a general principle, we agree that circumstantial evidence can suffice to defeat summary judgment in appropriate circumstances; of course a plaintiff is not required to prove his or her case by direct proof alone. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983) ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence."). Neither do we doubt that direct evidence can often be difficult to come by in the context of wrongful disclosure claims; the verbal transmission of private information often leaves no paper trail, and neither the source nor the receiver of such information generally has any incentive to admit to taking part in the disclosure. Even so, the standard at summary judgment still requires Ms. Touhy to come forward with evidence sufficient for "a fair-minded jury [to] return a verdict" in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990). The various pieces of circumstantial evidence put forward by Ms. Touhy do not pass this threshold.

The testimony that Ms. Whitlock and Ms. Frazier were good friends and that Ms. Frazier was Mr. Abrams's girlfriend shows at most that communication between the three individuals was possible or even likely; it does nothing to

indicate the *content* of any communication. The same can be said of the evidence showing various other social connections between Ms. Whitlock and Mr. Abrams. The hostile email to Ms. Touhy revealing that Ms. Frazier knew about Ms. Touhy's condition indicates nothing about where Ms. Frazier acquired the information, and Ms. Frazier's knowledge is unsurprising given that Mr. Abrams, her boyfriend, already knew about Ms. Touhy's condition at that time. Finally, Ms. Whitlock's testimony that she knew that Mr. Abrams at some point identified her as his source of information provides no basis to infer that she actually was the source given that she also testified that it was counsel for Walgreen – not Ms. Frazier or Mr. Abrams – who informed Ms. Whitlock that Mr. Abrams had previously identified her as his source.

To be sure, the circumstantial evidence demonstrates that Mr. Abrams and Ms. Whitlock are sufficiently connected to one another socially – primarily by way of Ms. Frazier – so that a jury could reasonably conclude that *something* said by Ms. Whitlock to Ms. Frazier would eventually find its way to Mr. Abrams. Jurors, after all, are allowed to bring with them knowledge of how back fence gossip works. But the claims Ms. Touhy pursues require more than that. To prevail in this case, Ms. Touhy must prove that Ms. Whitlock *accessed* and then *disclosed* Ms. Touhy's confidential health information. Other than the bare fact she worked for Walgreen, there is no competent evidence, circumstantial or otherwise, to indicate Ms. Whitlock did anything of the sort.

The case on which Ms. Touhy perhaps most relies in her argument against summary judgment actually illustrates, by comparison, the insufficiency of the evidence she has offered. In *Doe v. U.S. Postal Serv.*, 317 F.3d 339 (D.C. Cir. 2003), the plaintiff postal worker (referred to by the court as Mr. Doe) had been diagnosed with HIV but did not disclose that information to anyone at the Postal Service until he submitted a request for medical leave. When Mr. Doe eventually returned to work, he found that news of his health condition had been disseminated broadly among his co-workers. Although Mr. Doe lacked direct evidence that anyone at the Postal Service disclosed information retrieved from his leave request, the circumstantial evidence suggesting that conclusion was strong. Co-workers identified Mr. Doe's management-level supervisor as one who had shared news of Mr. Doe's HIV, and testimony indicated that this very supervisor was the person responsible for reviewing medical leave requests like Mr. Doe's. *See id.* at 340-43. To approximate the strength of the circumstantial evidence present in *Doe*, Ms. Touhy would have to show from some non-hearsay source that Ms. Whitlock actually disseminated the news of Ms. Touhy's condition, that Ms. Whitlock worked at the store where Ms. Touhy filled her prescriptions and was on duty when the Valtrex prescription was filled, or perhaps that Ms. Whitlock had a general assignment of reviewing all prescriptions for Valtrex. Ms. Touhy, however, has no such evidence.

\* \* \*

Juries may render verdict on facts and common sense inferences from those facts. But they may not do so with only mere gossip, speculation, or surmise. For this reason, we require plaintiffs to present competent evidence – whether direct or circumstantial – showing a basis from which a reasonable jury could find the defendant liable. Ms. Touhy has failed to present any admissible evidence indicating Ms. Whitlock's involvement in accessing and disclosing Ms. Touhy's health information, and granting summary judgment was thus the only appropriate path for the district court to take in this case. Though Ms. Touhy believes she could have unearthed persuasive evidence had the district court granted her motion to compel, we cannot see how the district court abused its considerable discretion in its resolution of the parties' discovery disputes given the nature of the requests at issue and the state of the record before the court at the time.

*Affirmed.*